**Gloria BAYLIS and Theodore Baylis, Plaintiffs Below, Appellants,**

v.

**The WILMINGTON MEDICAL CENTER, INC., a corporation of the State of Delaware and Carl P. Mulveny, M.D., Defendants Below, Appellees.**

Supreme Court of Delaware.

Submitted: Jan. 23, 1984.

Decided: April 24, 1984.

Bayard Marin, Marin & Hudson, Wilmington, for appellants.

C. Vincent Scheel, Young, Conaway, Stargatt & Taylor, Wilmington, for appellee physician; F. Alton Tybout, Tybout, Redfearn, Casarino & Pell, Wilmington, for appellee and cross-appellant, Wilmington Medical Center.

Before McNEILLY, HORSEY and MOORE, JJ.

MOORE, Justice:

This is an appeal from a Superior Court order granting summary judgment to defendant Dr. Carl Mulveny ("Dr. Mulveny") and partial summary judgment to defend-

ant Wilmington Medical Center ("Hospital") regarding their treatment of the plaintiff, Mrs. Gloria Baylis, in 1973. The Hospital cross-appealed the denial of summary judgment on two of plaintiff's claims against it. Because there are material issues of fact concerning the care and treatment provided by Dr. Mulveny and the Hospital to Mrs. Baylis, we reverse and remand for trial. We dismiss the cross-appeal as an unappealable interlocutory order under Del.S.Ct.R. 42(b).

I.

The plaintiff was admitted to the Hospital for observation on July 27, 1973. She had a skin rash, severe muscle pains, fever, and eosinophilia, a condition evidencing an overabundance of white blood cells which combat parasites. Her daughter also was being treated at the Hospital for the same symptoms. Mrs. Baylis was hospitalized until September 1, 1973. Defendant Dr. Mulveny was her primary physician during the hospitalization.

Despite exhaustive testing and consultation with several specialists, the plaintiff's primary illness has never been determined conclusively. However, it is undisputed that while hospitalized her condition worsened materially.

As of August 2, 1973, six days after admission, Mrs. Baylis had developed and was treated for pneumococcal pneumonia. Her fever increased, and she was placed in isolation. On that date, Dr. Mulveny learned that two types of parasitic worm larvae had been found in the stool of Mrs. Baylis' dog—toxocara canis and trichuris volpus. Dr. Mulveny had requested that a veterinarian examine the dog to determine if Mrs. Baylis' illness might be caused by parasitic infestation, despite the fact that toxocariasis, dog hookworm, is not common among adults.

Given the results of the veterinary examination and Mrs. Baylis' symptoms, Dr. Mulveny ordered a muscle biopsy of Mrs. Baylis' calf muscle on August 6, 1973 to determine whether she had trichinosis, a worm infestation usually carried by pigs. The biopsy, not performed until ten days later on August 16, was negative for trichinosis.

Dr. Mulveny began administering a drug, thiabendazole,[1] to Mrs. Baylis on August 9th. He testified that by August 9th, he knew she did not have trichinosis because she then had marked liver enlargement and a rise in liver enzymes. These conditions were not symptomatic of trichinosis, since trichinosis does not involve the liver. At this point, Dr. Mulveny's "best guess" was a toxocara canis, or dog hookworm, infestation, which is known to affect the liver. Dr. Mulveny testified that the biopsy was performed despite his elimination of trichinosis, in order to make a complete diagnosis.

A spinal tap to test for meningitis was taken on August 9, but was later "lost" due to a refrigerator break down. Bacteria causing meningitis have a short lifespan if not refrigerated. Consequently, a second painful tap was taken within a few hours. Similarly, the body of Mrs. Baylis' recently-expired pet parrot, which had been delivered to the Hospital for diagnostic testing, was lost and never recovered. At this point, while bed-ridden, Mrs. Baylis was suffering from severe diarrhea. The nurs-

---

1. Thiabendazole is a vermicidal drug used to combat various worm infestations in humans, including dog and cat hookworm, roundworm, whipworm, threadworm, and pinworm. Merck Manual, at 166–71 (13th ed. 1977). Accord Physician's Desk Reference, at 1305 (1984). Thiabendazole suppresses egg and/or larvae production and may inhibit subsequent development of eggs and/or larvae after expulsion from the body. Merck Manual, at 166–71 (13th ed. 1977). The drug has questionable effect on larvae which have migrated from the gastro-intestinal system to the muscle tissue. *Id.* Thiabendazole is available commercially under the name "Mintezol" in 500 mg. tablets, which are chewable or can be taken in a form suitable for dissolution and suspension in a liquid. Physician's Desk Reference, at 1305 (1984). We take notice of the fact that the drug was approved for human usage by the Food and Drug Administration (FDA) in April 1967. *Lutzcovich v. Nedwick,* Del.Ch., 134 A.2d 268, 271 (1957).

ing staff of the Hospital were aware of her incontinence. However, there is substantial evidence that she was forced to languish in her own feces and urine on many occasions due to the failure of the nursing staff to respond to her frequent requests for assistance.

Besides thiabendazole, Mrs. Baylis was given Mycostatin suspension, a liquid solution to be swished around the mouth and swallowed in order to combat oral monilia, a fungus infection. Other drugs administered to her were aspirin for the fever, darvon for the headache, lomotil for diarrhea, sleeping pills, valium for anxiety and muscle aches, and penicillin for pneumococcal pneumonia. The penicillin was discontinued on August 7 because Mrs. Baylis had recovered from the pneumonia. A new drug, gentromycin, was administered on August 8th on the recommendation of an infectious disease consultant, Dr. William Taylor, to combat the bacterial infection which had contributed to the pneumonia.

Part of Mrs. Baylis' treatment also involved the administration of a liquid solution through an intravenous device (I.V.) into a vein in her arm. On one occasion, the I.V. began to infiltrate, i.e., it pierced the vein wall and passed fluid into surrounding muscle tissue. When she complained, Mrs. Baylis was told that she would have to wait until morning, when the nurse responsible for the I.V. came on duty. When the nurse did arrive, she removed the I.V. immediately, telling Mrs. Baylis that it should have been removed the previous night. This infiltration continued overnight, causing Mrs. Baylis substantial discomfort. In addition, she was treated with a skin cream which, given her skin condition, caused an extreme burning sensation. When she complained, the at-

tending nurse discovered that the wrong cream had been applied to Mrs. Baylis' body. Finally, the record indicates that on one occasion, she was given mouthwash, rather than water, to swallow a pill.

By August 9, Mrs. Baylis' rash had developed into exfoliative dermatitis which caused her skin to shed heavily. She began to lose consciousness for long periods, and she was clinically deteriorating. In fact, counsel for Dr. Mulveny admitted at oral argument that Mrs. Baylis was dying. Dr. Mulveny's consulting dermatologist, Dr. Katzenstein, informed him that medical literature indicated skin exfoliation and rash may occur in toxocara canis infestations. Dr. Mulveny testified that given the liver enlargement, the clinical deterioration, the test results on Mrs. Baylis' dog, and the medical literature, he diagnosed her as suffering from toxicariasis. Dr. Mulveny then administered 1 gram of thiabendazole every 12 hours for a total of 4 doses.

Within one or two days, Mrs. Baylis' clinical deterioration ceased and her condition began to improve slowly. By August 13, her fever had subsided substantially and she regained consciousness.

On August 15, Mrs. Baylis was taken out of isolation. By August 18, she was out of bed twice. She regained control of her bowels, and her diarrhea subsided. Her skin rash also began to subside. However, her skin continued to shed heavily, peeling off in large sheets. At the same time, her hair began to fall out. On September 1, 1973, Mrs. Baylis was discharged at her own request.

Approximately six months later, she developed skin conditions which, according to her medical expert, were "compatible with toxic epidermolysis".[2]

---

**2.** Toxic epidermal necrolysis is a skin eruption characterized by large areas of loosened, easily detached epidermis, the outer layer of skin, composed of dead cells. The skin has a scalded appearance. Merck Manual, at 1597 (13th ed. 1977). Toxic epidermal necrolysis is caused by allergic or other physiological reactions to administration of a drug. *Id.* at 1596.

It should be noted that exfoliative dermatitis has similar etiology and symptoms. Exfoliative dermatitis may be induced by a systemic drug such as penicillin or a barbiturate. *Id.* at 1572. As to symptoms, the entire skin surface becomes red and scaly, and can crust. Body temperature can increase, and weight loss can result. *Id.* at 1572–73.

Subsequently, Mrs. Baylis filed a medical malpractice complaint against Dr. Mulveny and the Hospital, charging improper treatment and care. She later requested that a Malpractice Review Panel be convened.[3] After a three day hearing the Panel concluded that both Dr. Mulveny and the Hospital had met the applicable standards of care in treating the plaintiff. Mrs. Baylis then sought court review of the Panel's decision. The Superior Court affirmed the Panel opinion on February 19, 1981, and we dismissed plaintiff's appeal from that order.

After the Panel hearing Mrs. Baylis was permitted to amend her complaint to allege lack of actual or informed consent to administration of thiabendazole. She now presses five allegations of malpractice against Dr. Mulveny: (1) negligence in deciding to use thiabendazole, and in administering it in an excessive dosage, (2) failure to obtain her informed consent before administering the drug, (3) failure to employ timely antibiotic therapy, (4) failure to isolate plaintiff, and (5) failure to oversee the nursing care provided to her. Mrs. Baylis maintained two claims of malpractice against the Hospital, one challenging its failure to provide sterile and isolated treatment, and the other challenging the Hospital's failure to provide proper care due to the lack of attentive nursing, loss of the body of Mrs. Baylis' dead pet parrot which had been delivered to it to test for various bacterial diseases, loss of the first spinal tap, use of improper skin cream, and failure to correct intravenous infiltration. As to the Hospital's failure to provide attentive nursing, Mrs. Baylis claimed that she had been given mouthwash, rather than water, to swallow a pill, that she was not given any padding to reduce skin irritation, that her biopsy was unnecessarily painful, and that despite her constant diarrhea, the nursing staff failed to clean her body promptly, thus aggravating the discomfort of her skin condition. Both Dr. Mulveny and the Hospital then moved for summary judgment. The Superior Court granted summary judgment for Dr. Mulveny on all five claims, and partial summary judgment for the Hospital with respect to all claims of negligence except the use of mouthwash to administer a pill and the application of improper skin cream.

## II.

On appeal, Mrs. Baylis argues that substantial issues of material fact exist regarding the treatment provided by defendants. As to the doctor, Mrs. Baylis argues that in the absence of a diagnosis, the use of thiabendazole was a breach of the standard of care, because of its known side-effects, which could severely affect a critically-ill patient like Mrs. Baylis, and because the drug has no effect on the parasitic stage of toxocariasis, dog hookworm. Mrs. Baylis also argues that Dr. Mulveny did not obtain her informed consent prior to administering the drug, claiming that the drug had not been approved for human usage by the Food and Drug Administration (FDA) in 1973. Mrs. Baylis argues further that she contracted pneumonia because Dr. Mulveny failed to place her in isolation, failed to provide timely antibiotic therapy, and failed to oversee properly the nursing care provided to her.

As to the Hospital, Mrs. Baylis argues that it breached the standard of care owed her in losing the first spinal tap, in failing to use padding to reduce her skin irritation, in failing to respond timely to her sanitary needs, in applying the wrong skin cream, in using mouthwash rather than water to ad-

---

**3.** Section 6802(b) of the Delaware Health Care, Malpractice, Insurance, and Litigation Act of 1976 provides in part that "[i]n any civil action alleging malpractice ... any party shall have the right to convene a malpractice review panel ... by filing a demand therefor ..." 18 *Del.C.* § 6802(b) (Supp.1982). Under the Act, malprac- tice review panels are charged with investigating and determining whether the applicable standards of medical care have been met in a given case. *Id.* § 6811(b). Parties aggrieved by an opinion of a malpractice review panel have the right to review by the Superior Court. *Id.* § 6811(d).

minister a pill, and in failing to monitor intravenous feeding devices.

She supports her arguments regarding the negligence of Dr. Mulveny and the Hospital with three affidavits of a medical expert, Dr. S. Michael Phillips.[4] Dr. Phillips stated that in all medical probability, the improper use of high levels of thiabendazole aggravated Mrs. Baylis' skin condition, and that the medical records did not rule out a drug-induced skin condition compatible with toxic epidermolysis. Dr. Phillips stated further that the use of the drug was based on a national standard of care and that "at the time it was administered, the thiabendazole obtained was not approved by the FDA for human use and was obtained from a veterinary source". Dr. Phillips noted that there was inadequate documentation of the disease Mrs. Baylis had, that thiabendazole has no effect on the parasite stage, and that the amount prescribed was approximately ten times the optimal dose. Dr. Phillips therefore concluded that the drug should not have been administered without the consent of her next of kin. In addition, Dr. Phillips stated that Mrs. Baylis should have been placed in isolation earlier.

Apart from the drug treatment, Dr. Phillips opined that the Hospital care, nursing care, and hygenic care given to Mrs. Baylis breached any standard of care. In particular, he observed that losing the first spinal tap caused a painful second tap to be taken and delayed an early diagnosis. He also charged that the loss could have been prevented by processing the fluid immediately, or by placing a safety censor on the refrigerator. Dr. Phillips asserted that the loss of the parrot further delayed an early diagnosis by preventing testing for other diseases such as salmonellosis or psittacosis.[5]

As to the lack of padding, he stated that "sheep skin" or other padding might have reduced Mrs. Baylis' skin breakdown. Regarding the mouthwash incident, Dr. Phillips stated that this temporary discomfort would be critical to someone in Mrs. Baylis' condition. Finally, Dr. Phillips said that because of the increased portals of entry for extraneous, possibly-harmful matter in Mrs. Baylis' skin, due to her skin condition, application of the wrong skin cream could have caused an extreme burning sensation. Dr. Phillips stated that the increased portals of entry made proper sanitary care imperative and that the nursing failure to clean Mrs. Baylis of her feces and urine during periods of incontinence was a breach of the standard of care. Finally, Dr. Phillips testified that while infiltrating I.V.'s are common, an untimely nursing response to the problem is negligence.

The defendants respond that the use of thiabendazole was not actionable negligence, because Dr. Phillips' expert medical testimony failed to provide a causative link between its use and Mrs. Baylis' skin problems. Moreover, it is argued that Dr. Phillips was not qualified to speak to the applicable standard of care. As to the failure to isolate Mrs. Baylis in a timely manner, the defendants argue that the plaintiff was isolated as soon as she developed pneumonia, and that Dr. Phillips forges no causative link between the failure to isolate timely and any injury to the patient. Regarding the antibiotic therapy claim, the defendants argue that Dr. Addis' testimony before the panel is insufficient to raise any factual issues because that testimony is silent on the standard of care and on causation.

---

4. However, Dr. Phillips did not speak to Dr. Mulveny's failure to provide timely antibiotic therapy. Mrs. Baylis' family physician, Dr. Hunter Addis, testified before the malpractice review panel that he would have given antibiotics to her much earlier as a precaution. This testimony was part of the record before the Superior Court pursuant to 18 *Del.C.* § 6812 (Supp.1982).

5. Psittacosis, popularly known as parrot fever, is a bacterial disease usually transmitted by inhaling the feather or excreta dust of infected birds. Salmonellosis is another bacterial disease caused by indirect or direct contact with an infected animal or its excreta. Merck Manual, at 91, 617 (13th ed. 1977).

### III.

Superior Court Civil Rule 56(b) provides that when a motion for summary judgment is filed and properly supported by affidavits, the burden shifts to the non-moving party to set forth by affidavit, deposition, or through discovery, specific facts showing that there is a genuine issue of material fact for trial. Del.Super.Ct.Civ.R. 56(e). This Court has held that in a medical malpractice action, proper support for a defendant's motion requires proof that the defendant conformed to the requisite standard of care under the circumstances at issue. *Coleman v. Garrison*, Del.Supr., 349 A.2d 8, 10 (1975); *Hurtt v. Goleburn*, Del.Supr., 330 A.2d 134, 135 (1974). This, in turn, requires proof of the relevant medical standards followed by physicians in good standing in the community under like circumstances and a showing that the defendant's conduct was in conformity with those standards. *Hurtt*, 330 A.2d at 135. Throughout, the facts are viewed in the light most favorable to the nonmoving party. *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*, Del.Super., 312 A.2d 322, 325 (1973).

Section 6853 of the Delaware Health Care Malpractice Insurance and Litigation Act of 1976 specifies the required proof as to the standard of care in a medical malpractice claim. *See* 18 *Del.C.* § 6853 (Supp. 1982). It provides in part:

> [n]o liability shall be based upon asserted negligence unless expert medical testimony is presented as to the alleged deviation from the applicable standard of care in the specific circumstances of the case and as to the causation of the alleged personal injury ... except that such expert medical testimony shall not be required if a malpractice review panel has found negligence to have occurred and to have caused the alleged personal injury

... and the opinion of such panel is admitted into evidence ...

18 *Del.C.* § 6853 (Supp.1982).

Delaware's "wandering expert" statute, at 18 *Del.C.* § 6854, sets forth the competency requirements for expert medical testimony. See 18 *Del.C.* § 6854 (Supp. 1982). It provides that no person is competent to give such testimony as to applicable standards of skill and care unless he or she is "familiar with that degree of skill ordinarily employed in the community or locality where the alleged malpractice occurred, under similar circumstances, by members of the profession practiced by the health care provider ..." *Id.* § 6854(a).[6] The statute seeks to limit the effectiveness of the so-called "wandering expert," who finds malpractice present in any medical procedure and who has, somewhere in his or her background, sufficient credentials to make him or her appear to be a qualified expert. *Loftus v. Hayden*, Del.Supr., 391 A.2d 749, 751–52 (1978).

This Court has held that "all relevant factors must be considered and balanced" in determining whether a medical expert witness has sufficient "familiarity" with community skills to qualify under section 6854(a). *Loftus v. Hayden*, Del.Supr., 391 A.2d 749, 753 (1978) (noting that experts can acquire requisite "familiarity" in many ways). Furthermore, each factor must be considered in light of the difficulty of the particular medical problem, its diagnosis, and its treatment, in light of the time the witness has given to each factor, and in light of whether the standard is national or regional. *Id.*

Addressing each of the claims presented by Mrs. Baylis, we turn first to the use of thiabendazole. Preliminarily, we note that the trial court properly concluded that Dr. Phillips was a qualified expert, given his experience and academic credentials. Dr. Phillips, a specialist in internal

---

6. The term "health care provider" is defined at 18 *Del.C.* § 6801(5) (Supp.1982). Section 6854(b) presumes competent any physician who has actively practiced medicine or surgery for the past five years and who meets other criteria set forth in section 6854(b). *Id.* § 6854(b).

medicine and immunology, observed that the standard of care regarding the drug was a national standard based on his knowledge of FDA regulations and that use of high levels of the drug aggravated Mrs. Baylis' skin condition, causing a condition compatible with toxic epidermolysis. Dr. Phillips has sworn that "at the time *it* was administered, *the thiabendazole obtained* was not approved by FDA for human use and was obtained from a veterinary source". (Emphasis added). Finally, Dr. Phillips stated that given the drug's FDA status, its dangerous side effects, and the high dosage, the consent of Mrs. Baylis' next of kin should have been obtained. Clearly, Dr. Phillips' sworn statements were sufficient to raise a genuine factual question: (1) regarding the propriety of using thiabendazole, and (2) whether it caused Mrs. Baylis' skin to deteriorate further. His affidavits also raise an issue of fact regarding the lack of Mrs. Baylis' informed consent under 18 *Del.C.* § 6852(a) (Supp.1982).[7]

■ In so concluding, however, we note that at oral argument Dr. Mulveny's counsel excepted strongly to any implication that thiabendazole was not approved for human use when it was administered to Mrs. Baylis. At first glance, Dr. Phillips' statement quoted immediately above appears to be unequivocal. However, it is arguably a statement indicating only that the particular consignment of thiabendazole given to Mrs. Baylis was not FDA-ap-proved, which may be true because the FDA does not approve each consignment of every prescription drug given by a doctor to a patient. Nonetheless, what is before us raises a material issue of fact. Accordingly, we direct the trial court to determine whether this particular statement in Dr. Phillips' affidavit is within the ambit of Del.Super.Ct.R. 56(g).[8] If that is found to be the case, then we direct the Superior Court to impose appropriate sanctions in accordance with Del.Super.Ct.R. 56(g).[9]

■ Turning to Mrs. Baylis' claims regarding Dr. Mulveny's failure to isolate her in time and to order timely antibiotic therapy, Dr. Phillips asserted that Mrs. Baylis' in-hospital infections, which included pneumonia and monilia, a mouth fungus, might have been avoided had she been isolated earlier. As to antibiotics, Mrs. Baylis' family physician, Dr. Addis, testified before the malpractice review panel that he would have ordered such therapy much earlier as a precaution. In contrast, Dr. Mulveny did not order any antibiotics until Mrs. Baylis had already caught pneumococcal pneumonia. We therefore conclude that material factual questions do exist whether Dr. Mulveny timely ordered antibiotic therapy and isolated Mrs. Baylis, and conversely, if he failed to do so, whether her bacterial infections added to her pain and suffering.

■ Finally, in addressing Dr. Mulveny's failure to oversee properly the nursing

---

7. 18 *Del.C.* § 6852(a) states in part that:
   [n]o recovery of damages based upon a lack of informed consent shall be allowed in any action for malpractice unless:
   (1) The injury alleged involved a nonemergency treatment ...; and
   (2) The injured party proved ... the health care provider did not supply information regarding such treatment ... to the extent customarily given ... by other licensed health care providers with similar training and/or experience in ... similar health care communities.
   18 *Del.C.* § 6852(a) (Supp.1982).

8. Del.Super.Ct.R. 56(g) provides:
   Should it appear to the satisfaction of the Court at any time that any of the affidavits presented pursuant to this Rule are presented in bad faith or solely for the purpose of delay, the Court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused him to incur, including reasonable attorney's fees, and any offending party or attorney may be adjudged guilty of contempt. Del.Super.Ct.R. 56(g).

9. We have taken judicial notice of the fact that the FDA approved thiabendazole for human use in April 1967, over 15 years before Dr. Phillips filed the affidavit in question. (See note 1). Thus, Dr. Phillips' apparently unequivocal sworn statement is perplexing in light of his claimed "knowledge of Food and Drug Administration law and regulations".

care, and the impropriety of that care, we conclude that Mrs. Baylis has clearly set forth sufficient, specific facts to raise a triable issue. It is important to note that Mrs. Baylis was a critically-ill patient who was unconscious for long periods, requiring an artificial respirator to breathe. In fact, for a large portion of her hospitalization, she was dying.

Despite her critical state, known to Dr. Mulveny and relevant Hospital staff, Mrs. Baylis was forced to undergo two painful spinal taps due to a refrigerator break down. Given her physical condition and the lack of any diagnosis, it is difficult to understand why the spinal fluid was not immediately analyzed or why the refrigerator was not monitored. Dr. Phillips so stated. The loss of the dead pet parrot is similarly difficult to justify, given the defendants' claim that they were actively seeking any information leading to a diagnosis.

Although Mrs. Baylis was bedridden for nearly three weeks and suffering a severe skin rash and exfoliation, no padding was provided to her. Yet, Dr. Phillips concluded that such padding might have reduced her substantial skin breakdown, as well as relieving her discomfort. In addition, given the increased porous qualities of Mrs. Baylis' skin and the demonstrated danger of bacterial infection, the nursing failure to remove Mrs. Baylis' feces from her bed, raises a serious question as to egregious deviations from the standard of care. Moreover, assuming the validity of Dr. Mulveny's toxocariasis diagnosis, exposing Mrs. Baylis' porous skin to her own possibly, egg-bearing feces was, to say the least, counter-productive.

The final challenge to the propriety of her nursing care, the malfunctioning intravenous device, is not de minimus, given Mrs. Baylis' clinical deterioration to a point near death. This is corroborated by the affidavit of Dr. Phillips. Thus, we conclude that Mrs. Baylis has raised genuine issues of material fact regarding the impropriety of the hospital care she received, and Dr. Mulveny's failure to oversee that care, given his status as her attending physician.

■ As to the cross-appeal, which involved the mouthwash and skin cream claims, the trial court denied summary judgment. However, that ruling is not an appealable interlocutory order.[10] Accordingly, we dismiss these two claims as unappealable under Del.S.Ct.R. 42(b). *See Cross v. Hair*, Del.Supr., 258 A.2d 277, 278 (1969). *Accord. Hoofe v. Keene Corp.*, Del.Supr., 276 A.2d 269, 270 (1971).

In sum, we hold that Mrs. Baylis has raised genuine issues of material fact regarding the use of thiabendazole, the lack of informed consent, the failure to isolate, the failure to provide antibiotic therapy, the failure to oversee nursing and hospital care, and the impropriety of that care. Accordingly, the order of the Superior Court granting summary judgment to Dr. Mulveny is reversed, and the order granting partial summary judgment to the Hospital is similarly reversed. The case is remanded for trial. The Hospital's interlocutory cross appeal is dismissed.

\*　　\*　　\*　　\*　　\*　　\*

**APPEAL REVERSED AND REMANDED: CROSS–APPEAL DISMISSED.**

---

10. Moreover, no application for certification of an interlocutory appeal was made to the trial court, as mandated by Supreme Court Rule 42(c), and no such appeal was accepted by us in accordance with Rule 42(d). Indeed, the issues raised by the Hospital completely fail to meet the criteria then in effect for taking such an appeal.