OLIVER B. CANNON & SONS, INC., a Pennsylvania corporation, Plaintiff,

v.

DORR–OLIVER INCORPORATED, a Delaware corporation, et al., Defendants,

S. C. M. Corporation, a New York corporation, Additional Defendant on Counterclaim,

William H. Rorer, Inc., a Pennsylvania corporation, Additional Defendant on Cross-Claim.

Superior Court of Delaware, Sussex.

Sept. 18, 1973.

Courtney H. Cummings, Jr., Wilmington, for plaintiff.

David T. Dana, III, and James T. Mc-Kinstry, Wilmington, for defendant Barcroft Co.

## OPINION AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANT BARCROFT'S COUNTERCLAIM: MOTION DENIED

QUILLEN, Chancellor:[1]

In May of 1968, Barcroft Company ("Barcroft") entered into an agreement with Dorr-Oliver Incorporated ("Dorr"), whereby Dorr was to design and construct a plant for the production of magnesium hydroxide paste on Barcroft's site at Lewes, Delaware. Dorr subcontracted out a portion of this project (preparing and painting the interior linings of certain chemical process tanks) to Oliver B. Cannon & Sons, Inc. ("Cannon"), a paint contractor. Pursuant to a purchase order dated June 13, 1969, Cannon agreed to apply Glid-Flake paint linings to fourteen tanks at the Lewes plant. Glid-Flake is produced by third-party defendant SCM Corporation's Glidden-Durkee Division.

In December 1969, Cannon finished painting the tanks. By late January 1970 the lining of one of the tanks (IS-103) began to show evidence of deterioration. And, by late May 1970 Barcroft was forced to close its plant because the linings of several tanks were coming off in large sheets and the tanks were rusting. The actual cause of this lining failure is a point of vigorous contention among the parties.

Upon requests from Barcroft and Dorr, Cannon performed repair work on all the tanks. Through Dorr, Barcroft paid Cannon $94,306.34 in connection with the repairs.

In January of 1971, Cannon filed suit against Dorr, as general contractor, demanding an additional payment of $113,914.23 for the relining of the chemical process tanks. Cannon also filed a claim for a mechanic's lien in the same amount against Barcroft.[2]

Alleging that Cannon failed to properly furnish paint linings for the tanks in question, Dorr counterclaimed against Cannon for $118,599.17. Barcroft also filed a counterclaim against Cannon which is the subject of this motion.

In Count I of its counterclaim, Barcroft seeks the return of the $94,306.34 paid Cannon in connection with the repair work. Barcroft alleges that Cannon was contractually obligated to repair, at its own expense, the defective paint linings. Barcroft further claims that the $94,306.34 was only paid under protest through Dorr to Cannon as an inducement for Cannon to fulfill its contractual obligations.

In Count II of its counterclaim Barcroft charges that the Glid-Flake lining failure was the result of Cannon's negligent workmanship.[3] As a result, Barcroft seeks

---

1. I am sitting in the Superior Court by special assignment as set forth in the order of the Chief Justice dated August 14, 1973. See Art. 4, § 13 of the Constitution, Del.C. Ann.

2. By letter opinion dated October 11, 1972, this Court granted Barcroft's motion for summary judgment on Cannon's mechanic's lien claim.

3. Count II alleges that Cannon was negligent in that Cannon:
   "(a) Failed to follow the customary usual practices of its trade;
   (b) Failed to comply with the specifications with which it was obligated to comply;
   (c) Improperly mixed the paint lining components in the process of application to said tanks;
   (d) Failed to properly prepare the interior tank surfaces before applying the paint linings; and
   (e) Failed to exercise the standards of expertise and specialized knowledge which it professed to have and upon which it induced Barcroft to rely."

damages in the total amount of $420,856.36, consisting of (a) the $94,306.34 paid by Barcroft through Dorr to Cannon, and (b) $326,550.02 in profits which were lost to Barcroft during the period when the plant was shut down for repairs.

Denying that it was contractually obligated to correct the defective paint linings or that it was negligent, Cannon has moved for summary judgment on Barcroft's counterclaim under Civil Rule 56 of this Court. Cannon contends that there is no issue of material fact with respect to Barcroft's counterclaim and that it is entitled to summary judgment as a matter of law. This is the decision on Cannon's motion.

In weighing a motion for summary judgment under Rule 56, the Court must examine the present record, including pleadings, depositions, admissions, affidavits, and answers to interrogatories. Continental Cas. Co. v. Ocean Acc. & Guarantee Corp., 8 Storey 338, 209 A.2d 743 (Super.Ct.1965). The facts must be viewed in a light favorable to the non-moving party (Barcroft), although uncontroverted evidence offered in support of the motion must be accepted as true. The moving party must show that, on unquestioned facts, he is entitled to a judgment as a matter of law. Matas v. Green, 3 Storey 473, 475, 171 A.2d 916, 918 (Super.Ct. 1961); 6 Moore's Federal Practice, § 56.-15(3); Superior Court Rules, Civil R. 56(c). Wilson v. Tweed, 8 Storey 391, 209 A.2d 899 (Sup.Ct.1965). The Court's function is not to weigh evidence or to accept that which appears to have greater weight. Continental Oil Co. v. Pauley Petroleum, Del.Sup., 251 A.2d 824 (1969).

An examination of the record indicates that one factual question is clearly in issue. The parties are unable to agree as to the cause of the Glid-Flake paint lining fail-ure. Barcroft and Dorr offer testimony tending to prove that the failure was due to negligent workmanship by Cannon. On the other hand, Cannon blames the lining failure on chemical attack allegedly occurring when Barcroft (without forewarning Cannon of its intentions) used the tanks to store chemicals of a higher toxicity than Glid-Flake was intended to withstand. At this stage, the Court must take the version most favorable to Barcroft and assume that Cannon was negligent. And, Barcroft's payment for the repair work cannot be called voluntary as a matter of law under any reasonable view of the case.

Assuming its negligence, Cannon argues that, as a matter of law, it is still entitled to summary judgment on Barcroft's counterclaim. Cannon denies that its performance under the purchase order contract with Dorr created any legal duty or obligation to Barcroft. Therefore, Cannon contends, Barcroft's counterclaim cannot stand either in contract or in tort. Accordingly, to decide the issue, the Court must determine whether Barcroft's relation to Cannon is such that the law entitles Barcroft to seek compensation, in contract or in tort, for Cannon's assumed negligence.

Before examining Barcroft's contract claim, the preliminary question of what law to apply must be disposed of. The rule in Delaware is that the courts look to the law of the place of contracting to determine the validity and construction of a contract. Wilmington Trust Company v. Pennsylvania Company, 40 Del.Ch. 1, 172 A.2d 63 (Sup.Ct.1961). It is unclear whether the Cannon-Dorr purchase order contract was executed in Pennsylvania or Connecticut. However, since Connecticut conflict of laws rules would apply Delaware law, and both Delaware and Pennsylvania apply general contract principles to the questions at issue, it is only necessary for the Court to apply general contract principles in reaching its decision. Jenkins v. Indemnity Ins. Co. of North America, 152 Conn. 249, 205 A.2d 780 (1964); Royal Indemnity Co. v. Alexander Industries, Inc., 8 Storey 548, 211 A.2d 919 (Sup.Ct. 1965); Sears, Roebuck and Co. v. Jardel Co., 421 F.2d 1048 (3 Cir. 1970).

Turning now to Barcroft's contract claim, Barcroft concedes that it had no direct contractual relationship with Cannon. Rather, Cannon performed under the terms of a purchase order contract which it made with Barcroft's general contractor, Dorr. Unless avoided, lack of privity would preclude Barcroft from recovering for breach of contract between Cannon and Dorr. However, Barcroft claims its status is that of a third-party creditor beneficiary, giving it rights under the Cannon-Dorr paint contract despite a lack of privity.

■ The Restatement of Contracts, § 133(1)(b) (1932) defines a creditor beneficiary in these terms:

"(1) Where performance of a promise in a contract will benefit a person other than the promisee, that person is . . .

"(b) a creditor beneficiary if no purpose to make a gift appears from the terms of the promise in view of the accompanying circumstances and performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary . . .".

See also, 2 Williston on Contracts (3rd ed.), § 361 at 863. Generally a secondary promise to discharge a prime promisee's duty creates a duty of the secondary promisor to the prime promisee (creditor beneficiary) to perform the promise. Restatement of Contracts, § 136(a).

■ Thus, the first question is whether Barcroft was a creditor beneficiary. To apply the Restatement framework to the case at bar, it would appear that Barcroft has certain indicia of a creditor beneficiary of Cannon's promise to Dorr that it would apply the Glid-Flake linings. No gift was intended since Dorr was contractually bound to construct the plant for Barcroft. And Cannon, as a subcontractor on the project, bound itself to perform its task in a workmanlike and non-negligent manner. Dorr's failure to fully disclose Barcroft's identity as owner of the property to Can-

non is not fatal to the claim. It is not necessary that the beneficiary be named and identified as an individual. Johnson v. Holmes Tuttle Lincoln-Mercury, 160 Cal. App.2d 290, 325 P.2d 193 (1958); 2 Williston on Contracts (3rd ed.), § 356A. The important fact is that Cannon knew its work was to be performed on the owner's property and for the owner's benefit.

■ Generally, in both Pennsylvania and Delaware, a third-party creditor beneficiary can sue for breach of the promisor's obligations owed it under the terms of the contract. Burke v. North Huntingdon Township, 390 Pa. 588, 136 A.2d 310 (1957); Clardy v. Barco Construction Co., 205 Pa.Super. 218, 208 A.2d 793 (1965); Wilmington Housing Authority v. Fidelity & Deposit Co., 4 Terry 381, 47 A.2d 524, 170 A.L.R. 1288 (Sup.Ct.1946); Royal Indemnity Co. v. Alexander Industries, Inc., *supra.*

■ However, because the performance promised must be such that it would in fact discharge the promisee's (Dorr's) obligation to the third-party beneficiary, the peculiar nature of the construction subcontract must be examined. The application of the creditor beneficiary rule depends on whether the third party is in fact a creditor beneficiary, a status which in turn depends on the intention of the parties to the contract as expressed therein. Burke v. North Huntingdon Township, *supra.* Professor Corbin explains the underlying principle in these terms:

". . . if a principal contractor contracts with a subcontractor for the supply of materials to be used by the former in erecting a structure, the owner is not a beneficiary of the subcontract. The same will ordinarily be true even though the subcontractor undertakes the incorporation of the materials into the structure, for the reason that this incorporation will not discharge the contractual duty of the principal contractor and the parties do not contemplate that it should. It is the principal contractor's

duty to erect and deliver the complete structure according to plans and specifications; and the subcontractor's work does not discharge that duty to any extent. His work is merely a preliminary step that will enable the principal contractor to perform. If the structure is destroyed after the subcontractor's work is done but before completion and delivery of the whole, the principal contractor is still under his contractual duty as a whole; the subcontractor's performance discharged it in no respect. This is of great importance to subcontractors, because it is possible that the principal contractor's breach may cause large consequential injury to the owner. In so far as this consequential injury was the foreseeable result of the subcontractor's breach of his contract with the principal, no doubt the latter can charge the former with the amount that he is compelled to pay to the owner. But the question whether it was a foreseeable result of the principal contractor's breach of the main contract is far from identical with the question whether it was a foreseeable result of the subcontractor's breach of his subcontract. Each question should be separately litigated between the two parties who are directly concerned.

"If the subcontract is not so made that its correct performance will discharge the duty of the principal contractor to the owner, the latter is not a creditor beneficiary of the subcontract. He is merely a creditor of the principal contractor; and he can make use of the principal contractor's claim against the subcontractor only as can any other creditor."

4 Corbin on Contracts, § 787, pp. 102–104 (1951).

■■■ This policy makes some sense in the context of the construction subcontract. However, it does not automatically defeat Barcroft's counterclaim in this case. An exception exists for subcontracts in which the subcontractor-promisor obligates and warrants his performance to the third party-owner as well as the principal contractor-promisee. As Corbin continues at page 104:

"If the parties to the subcontract contemplate the existence of the principal contractor's duty to the owner and the subcontract is so made that its correct performance will discharge that duty, the owner is a creditor beneficiary within the meaning of the term as used in this chapter."

The status of creditor beneficiary depends on the manifested intention of the parties to the contract. Spires v. Hanover Fire Insurance Company, 364 Pa. 52, 70 A.2d 828 (1950); Van Cor, Inc. v. American Casualty Co., 417 Pa. 408, 208 A.2d 267 (1965); Bryant, Griffith & Brunson v. General Newspapers, 6 W.W.Harr. 468, 178 A. 645 (Super.Ct.1935).

■■■ This rationale was followed in Sears, Roebuck and Co. v. Jardel Co., *supra*, the case upon which Barcroft primarily relies for the proposition that it is a third-party creditor beneficiary, entitled to sue Cannon for breach of its subcontract with Dorr.

The *Sears* case involved the question whether a building owner stood as a third-party creditor beneficiary to a contract between a general contractor and a subcontractor. In determining that the owner was indeed a third-party creditor beneficiary, the Circuit Court found that the subcontract explicitly contemplated the provision of services by the subcontractor to the owner. In the Circuit Court's view, the language of several sections of the subcontract clearly indicated that both parties intended that the owner be a beneficiary.

Two provisions of the contract involved in the *Sears* case are markedly similar to provisions in the Cannon-Dorr purchase order contract. Article I of the *Sears* subcontract parallels the definitional section

of the Cannon-Dorr agreement.[4] Both refer to the "Owner" of the location where the subcontractor's work is to be done. Article XIV of the *Sears* subcontract and Article XXVA of the Cannon-Dorr agreement also contain substantially similar indemnification provisions.[5]

Moreover, as in *Sears,* where the Court found other contractual language indicating intent to create rights in the third party owner,[6] the Cannon-Dorr Purchase Order contains additional provisions acknowledging rights created in the owner, Barcroft.[7]

The Court must, therefore, conclude that the Cannon-Dorr agreement, taken as a whole, can reasonably be read to demonstrate an intention by both parties to create for Barcroft the rights of a third-party creditor beneficiary to their contract. That would bar pretrial judgment as a matter of law. Continental Oil Co. v. Pauley Petroleum, Inc., Del.Sup., 251 A.2d 824 (1969).

It is not necessary at this stage to do any more than to conclude that the Cannon-Dorr agreement, taken as a whole, can reasonably be read to demonstrate an intention by both parties to create for Barcroft the rights of a third-party creditor beneficiary to their contract. In so doing, the Court does not ignore other provisions of the Cannon-Dorr purchase order which, it can be argued, manifest an obligation running from Cannon to Dorr and no further. Only Dorr was obligated to pay Cannon (Article III). Only Dorr could authorize changes in Cannon's work. (Article V). And only Dorr could terminate Cannon's subcontract. (Article X).

On this motion by Cannon for summary judgment, Cannon's contention that Bar-

---

4. As quoted by the Court in *Sears,* Article I provided:

> "The word 'Owner' shall mean JARDEL CO., INC., the Owner of the building [or buildings, Art. XXIV] of which the Sub-Contractor's [Hirsch's] work forms a part." 421 F.2d at 1054.

The "Definitions" section of the "Standard Sub-contract Terms and Conditions" of the Cannon-Dorr Purchase Order reads, in part:

> "OWNER—Party for whom CONTRACTOR is erecting plant or installation.
> JOBSITE—Location of plant or installation where SUBCONTRACTOR'S work will be performed."

5. As quoted by the *Sears* Court:

> "Article XIV of the Robbins, Inc.-Hirsch contract provided that Hirsch 'shall indemnify and save harmless the Owner . . . against all claims of damage to persons or property growing out of the execution of [Hirsch's] work.' Hirsch also agreed to 'indemnify and save harmless' Jardel from any damage arising out of Hirsch's work that could be asserted against the general contractor, Robbins, Inc." 421 F.2d at 1054.

Article XXVA of the Cannon-Dorr Purchase Order provides in part:

> "SUBCONTRACTOR shall hold CONTRACTOR and Owner harmless from any and all claims, liabilities and causes of action for injury to or death of any person, and for damages to or destruction of any property, resulting from any and all acts or omissions of SUBCONTRACTOR, its agents, employees and subcontractors, in connection with the performance of the Work, and shall defend any such claim asserted or brought against CONTRACTOR or Owner . . . ."

6. At one point the *Sears* Court notes:

> "The parties' intention that Hirsch's performance was to carry out the obligations of Robbins, Inc. to Jardel also appears in Articles I, II, XVI, XVIII, and XXIV." 421 F.2d at 1054, 1055.

7. Article VII, "Risk of Loss," provides, in part:

> ". . . title and right to the use of all Work shall pass to the CONTRACTOR or Owner as it is performed."

Article XI, "Liens" provides, in part:

> ". . . SUBCONTRACTOR shall, at its own expense furnish a bond in a form and amount and with surety satisfactory to CONTRACTOR, sufficient to indemnify CONTRACTOR and Owner against any lien or claim, . . . ."

Article XXIV, "Rules and Regulations" provides, in part:

> ". . . SUBCONTRACTOR shall abide by any other reasonable rules and regulations which may be imposed with respect to the performance of the work by the CONTRACTOR or Owner."

croft has no contract claim as a third-party creditor beneficiary must be denied.

The Court must now consider Cannon's motion for summary judgment on Barcroft's counterclaim in tort for negligence.

In Crowell Corporation v. Topkis Construction Co., Del.Super., 280 A.2d 730 (1971), the Superior Court ruled that, for want of a contractual relationship, an owner could not maintain a tort action against subcontractors for negligent workmanship in constructing the walls of his plant. The owner had occupied the building more than four years before complaining that the walls were defective and that corrective action was necessary to avert damage. Finding that no personal injury or dramatic incident such as an accident, collapse or explosion had taken place, the Court concluded that the "citadel of privity" [8] should not be disturbed.

While, even under the facts of *Crowell,* there may be some reason to question preservation of the citadel of privity,[9] this opinion does not question the recent authority of *Crowell* in deciding Cannon's motion for summary judgment. The Court believes that this case is readily distinguishable from the *Crowell* case.

In the first place, as the Court has already indicated, this case differs from the *Crowell* case because Barcroft cannot be said as a matter of law to be a mere incidental beneficiary. Moreover, viewing the facts in a light most favorable to Barcroft, the Court must conclude that it cannot be said as a matter of law that an "accident"

did not occur. The Glid-Flake lining failure was so complete and devastating in a relatively brief time as to require the complete shut down of Barcroft's operations.

This is a case of physical injury to property and not mere economic loss. It can be reasonably argued that there has been an accident [10] in the basic sense that there was in fact immediate physical injury to the storage tanks not caused by normal wear and tear. Stewart v. Cox, 55 Cal.2d 857, 13 Cal.Rptr. 521, 362 P.2d 345 (1961). Compare Seeley v. White Motor Company, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965); Melody Home Manufacturing Company v. Morrison, 455 S.W.2d 825 (Tex.Civ.App.1970); Steinberg v. Coda Roberson Construction Co., 79 N.M. 123, 440 P.2d 798 (1968).

While perhaps the western states have been more progressive than the eastern ones in this field of the law, the following language from Stewart v. Cox, *supra,* is useful in light of the *Crowell* "accident" test in a case involving physical injury to property:

". . . liability for negligence can exist without privity although the risk involved is only damage to property, and . . . the determination whether in a specific case the defendant will be held liable to a third person is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that

8. The Superior Court relying on Trans World Airlines v. Curtiss-Wright Corp., 1 Misc.2d 477, 148 N.Y.S.2d 284 (1955), said: "If the ultimate user were allowed to sue the manufacturer in negligence merely because an article with latent defects turned out to be bad when used in 'regular service' *without any accident occurring,* there would be nothing left of the citadel of privity and not much scope for the law of warranty. There seems to me to be good reason for maintaining that, *short of an accident,* the citadel should be preserved." (Emphasis supplied) 280 A.2d at 732.

9. See Prosser, "The Assault Upon the Citadel (Strict Liability to the Consumer)," 69 Yale L.J. 1099 (1960); Santor v. A & M Karagheusian, 44 N.J. 52, 207 A.2d 305, 16 A.L.R. 3rd 670 (1965); State v. Campbell, 250 Or. 262, 442 P.2d 215 (1968) (availability of a tort remedy should not depend upon whether the harm was traumatic).

10. According to Webster's Seventh New Collegiate Dictionary, an "accident" is " . . . an unexpected happening causing loss or injury . . . "

he suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, and the policy of preventing future harm. . . . The liability of a contractor or subcontractor must be determined by applying this general test rather than by arbitrarily placing them in a separate category subject to a special rule." (citations omitted)

In conclusion, the Court cannot say as a matter of law that Barcroft is barred from suing in contract as a third-party creditor beneficiary or in tort even under the accident standards of the *Crowell* case. The plaintiff's motion for summary judgment on the defendant Barcroft's counterclaim is therefore denied. It is so ordered.