**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| ERIC M. LEFORT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No.: N14C-11-039 EMD |
| v. | ) | |
| | ) | |
| MATTHEW T. RAHE and KAREN A. | ) | TRIAL BY JURY DEMANDED |
| KEOUGH, | ) | |
| | ) | |
| Defendants. | ) | |


**MEMORANDUM OPINION AND ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF THE DEFENDANTS ON THE REMAINING 42 U.S.C. § 1983 CLAIMS**

Before the Court is Defendants' Motion for Summary Judgment (the "Motion") filed by Defendants Matthew T. Rahe and Karen A. Keough (collectively, the "Defendants"), and the Plaintiff's Response to Defendants' Motion for Summary Judgment (the "Response") filed by Eric M. Lefort. The Court held a hearing (the "Hearing") on the Motion and the Response on June 3, 2016. At the Hearing, the Court granted summary judgment in favor of the Defendants on all claims except Mr. Lefort's 42 *U.S.C.* § 1983 Fourth Amendment Claim for False Arrest (the "4th Amendment Claim"). The Court took the issues regarding the 4th Amendment Claim and application of "Qualified Immunity" under advisement at the conclusion of the Hearing. The Court also asked the parties to submit the "Transcript of VOP Hearing dated December 13, 2013" to the Court for review. This Transcript was provided to the Court on June 3, 2016. The Court then held a pre-trial conference in this civil action on June 13, 2016. At the pre-trial conference, the Court provided some initial impressions on the remaining issues regarding the 4th Amendment Claim and Qualified Immunity, heard from counsel to the parties and, once again, took the matter under advisement. Upon consideration of the facts of this civil action, the law

and the argument of the parties, the Court holds that the Defendants are entitled to summary judgment on the 4th Amendment Claim.

## LEGAL STANDARD UNDER CIVIL RULE 56

The standard of review on a motion for summary judgment is well-settled.  The Court's principal function when considering a motion for summary judgment is to examine the record to determine whether genuine issues of material fact exist, "but not to decide such issues."[1] Summary judgment will be granted if, after viewing the record in a light most favorable to a non-moving party, no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.[2]  If, however, the record reveals that material facts are in dispute, or if the factual record has not been developed thoroughly enough to allow the Court to apply the law to the factual record, then summary judgment will not be granted.[3]  The moving party bears the initial burden of demonstrating that the undisputed facts support his claims or defenses.[4]  If the motion is properly supported, then the burden shifts to the non-moving party to demonstrate that there are material issues of fact for the resolution by the ultimate fact-finder.[5]

## FACTUAL BACKGROUND[6]

1.      On June 9, 2009, Mr. Lefort burned down the home of Shelly Lefort.  Ms. Lefort was the wife of Mr. Lefort.  At that time, Ms. Lefort was living in her home with her children.

---

[1] *Merrill v. Crothall-American Inc.*, 606 A.2d 96, 99-100 (Del. 1992) (internal citations omitted); *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*, 312 A.2d 322, 325 (Del. Super. 1973).
[2] *Id.*
[3] *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962); *see also Cook v. City of Harrington*, 1990 WL 35244 at *3 (Del. Super. Feb. 22, 1990) (citing *Ebersole*, 180 A.2d at 467) ("Summary judgment will not be granted under any circumstances when the record indicates . . . that it is desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.").
[4] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1970) (citing *Ebersole*, 180 A.2d at 470).
[5] *See Brzoska v. Olsen*, 668 A.2d 1355, 1364 (Del. 1995).
[6] In developing the facts for this Order, the Court reviewed the Motion, the Response, the Defendants' Appendix In Support of Their Motion for Summary Judgment and the December 13, 2013 VOP Hearing Transcript.

Mr. and Ms. Lefort were married but had separated. Ms. Lefort had obtained a Protection from Abuse Order against Mr. Lefort prior to June 9, 2009.

2. Mr. Lefort pled guilty to Burglary Second Degree and Arson Second Degree. The Court sentenced Mr. Lefort on November 3, 2009. The sentence (the "Sentencing Order") was: (i) Burglary Second Degree – 5 years at supervision level 5 suspended after 18 months at supervision level 5 followed by 1 year at supervision level 3 followed by 1 year at supervision level 2; (ii) Arson Second Degree – 5 years at supervision level 5 suspended after 2 years at supervision level 5 followed by 1 year at supervision level 3 followed by 1 year at supervision level 2.

3. The Sentencing Order provided the following terms and conditions concerning contact with Ms. Lefort and her children:

- Have no contact with the victim(s) Shelly Lefort, the victim's family or residence.

- Have no unauthorized contact unless by family court order with the victim(s).

The Sentencing Order further addressed contact with Ms. Lefort and the children:

- No contact with Shelly Lefort and her children except permitted by family court or visitation order or by Shelly Lefort.

4. Mr. Lefort and Ms. Lefort were divorced in 2010 while Mr. Lefort was incarcerated. According to a SCI Sussex Correctional Institution Report dated June 22, 2010 (the "DOC Report"), Mr. Lefort had some difficulties dealing with family issues while incarcerated. Mr. Lefort was told by his son that Ms. Lefort had a new boyfriend. The DOC Report provides that Mr. Lefort then "got on edge," became "angry" and "lost it." Mr. Lefort made statements during a family visit "what a shame it would be for the new house to burn down." Mr. Lefort also admitted to having made statements about harming the new boyfriend.

3

The DOC Report noted that Mr. Lefort had "a long history of substance abuse, violence, criminal thinking, behaviors, is extremely impulsive." It appears from the DOC Report that Mr. Lefort was willing to engage in counseling and alike to address these issues.

5. Mr. Lefort was released from level 5 on June 10, 2013. Because Mr. Lefort was released prior to the expiration of his unsuspended level 5 sentence, Mr. Lefort was on conditional release.

6. Mr. Rahe is an officer with the Delaware Department of Corrections, Probation and Parole ("Probation and Parole"). Probation and Parole had assigned Mr. Rahe to the domestic violence section of the probation office. Mr. Rahe directly supervised Mr. Lefort when Mr. Lefort was conditionally release on June 10, 2013.

7. Ms. Keough is also an officer with Probation and Parole. Ms. Keough supervised Mr. Rahe.

8. Mr. Lefort resumed contact with Ms. Lefort after he was released. Mr. Lefort testified that Ms. Lefort provided her consent to this contact. Ms. Lefort confirmed this and testified that she consented to contact when Mr. Lefort was first released from level 5 incarceration. Ms. Lefort also testified that she told Mr. Lefort that she did not want to pursue any type of relationship around the time of the Delaware State Fair (an event normally held in the last week of July). At all times between June 10, 2013 and August 6, 2013, Ms. Lefort was living in her house in Harrington (rebuilt from insurance proceeds after the fire) with two of her children and her fiancé Dustin Russum.

9. On May 24, 2013, Ms. Lefort wrote to a deputy attorney general (the "DAG") and requested that the "no contact order" in the sentence be changed to "no unlawful contact." Ms.

4

Lefort stated that she wanted this change because her children wanted both Mr. and Ms. Lefort to attend some of their upcoming events.

10. On June 10, 2013, the DAG wrote (the "June 10, 2013 Letter") the Court and requested a modification of the "no contact order" portion of the Sentence Order to a "no unlawful contact." On July 10, 2013, the Court wrote "approved" on the June 10, 2013 Letter. Subsequently, the Court added "Withdrawn by [DAG] on July 22, 2013" on the June 10, 2013 Letter.

11. On July 22, 2013, the DAG transmitted an e-mail to the Court. In this e-mail, the DAG noted that Ms. Lefort no longer wanted the no contact order changed to a no unlawful contact order. The DAG then requested the Court not act on the request made in the June 10, 2013 Letter. On July 22, 2013, Court staff advised the DAG that the Sentence Order would not be modified.

12. Nothing in the record indicates that Probation and Parole, Mr. Rahe or Ms. Keough had any knowledge of: (i) the June 10, 2013 Letter; (ii) the Court's action on July 10, 2013; (iii) the DAG's request to withdraw the June 10, 2013 Letter request on July 22, 2013 or (iv) the Court staff informing the DAG that the Sentencing Order would not be modified in accordance with the June 10, 2013 Letter.

13. The record indicates that Mr. Lefort continued to have contact with Ms. Lefort after July 22, 2013.

14. The Delaware State Police stopped Mr. Lefort on August 2, 2013. Mr. Lefort was transporting a person who had escaped from Delaware State Police Troop 3. The Delaware State Police trooper warned Mr. Lefort but did not charge him with any criminal offense. The trooper also told Mr. Lefort to report his police contact to Probation and Parole. The incident was

5

recorded by an officer at Probation and Parole. No one, including Mr. Rahe, at Probation and Parole filed a violation report or issued an administrative warrant for this event with the Court or the Board of Parole.

15. On August 6, 2013, Mr. Lefort went to the business office of Green Diamond Builders in Felton, Delaware. Dawn Catalano works for Green Diamond Builders. Ms. Catalano is the sister of Ms. Lefort's then-fiancé, Mr. Russum. Prior to August 6, 2013, Ms. Catalano had never met Mr. Lefort. Ms. Catalano, however, was aware of who Mr. Lefort was and knew about the 2009 arson. According to Ms. Catalano, Mr. Lefort engaged her in a conversation during which he (i) never made eye contact, (ii) provided a puzzling, nervous explanation about how Mr. Lefort was going to get back together with Ms. Lefort and (iii) disclosed that Mr. Lefort was having regular contact with Ms. Lefort. Ms. Catalano stated that she considered Mr. Lefort's statements to be a threat to the safety of her brother and to Ms. Lefort. Ms. Catalano described Mr. Lefort's appearance as menacing and threatening. After Mr. Lefort left, Ms. Catalano called Probation and Parole. Ms. Catalano reported to Mr. Rahe what Mr. Lefort had said and done. Ms. Catalano also contacted Mr. Russum and Ms. Lefort, warning them about what had happened.

16. Mr. Lefort testified that he had gone to Green Diamond Builders and talked to Ms. Catalano. Mr. Lefort admitted that he had not gone to Green Diamond Builders for any business reason. Instead, Mr. Lefort said he went there to provide information to Ms. Catalano about Mr. Russum in the hope that Mr. Russum would then "depart his relationship" with Ms. Lefort.

17. Mr. Lefort had an appointment with Probation and Parole on August 6, 2013. Prior to the meeting, Mr. Rahe met with Ms. Keough regarding Mr. Lefort's visit to Green

6

Diamond Builders and Ms. Catalano. Ms. Keough authorized Mr. Rahe to arrest Mr. Lefort for violating the no contact provisions of his sentence.

18. Mr. Rahe met with Mr. Lefort on August 6, 2013. At the end of the meeting, Mr. Rahe asked Mr. Lefort if he had been having contact with Ms. Lefort after his release from prison on June 10, 2013. Mr. Lefort admitted that he had been having contact. Mr. Rahe told Mr. Lefort that Mr. Lefort was in violation of his probation. In response, Mr. Lefort stated that he should have lied about the contact with Ms. Lefort. Mr. Lefort never advised Mr. Rahe that he had the consent of Ms. Lefort to contact her.

19. On August 6, 2013, Mr. Rahe obtained an administrative warrant for the violation. Mr. Rahe filed the warrant with the Superior Court. Mr. Rahe should have filed the paperwork with the Board of Parole because Mr. Lefort was on conditional release.

20. Mr. Rahe discovered the mistake. On August 15, 2013, Mr. Rahe withdrew the warrant filed with the Court and refiled it with the Board of Parole.

21. On August 21, 2013, Mr. Lefort waived a preliminary hearing on his violation charge. There was a subsequent delay by the Board of Parole in scheduling Mr. Lefort's hearing.

22. On November 8, 2013, Mr. Rahe decided to take the affirmative step of filing a violation report as to Mr. Lefort's deferred probation in the Court. Mr. Rahe testified that he believed that the Court would hear the violation more quickly and, thus, move the case forward.

23. The Court held a hearing on the violation of probation on December 13, 2013. At that hearing, Mr. Lefort's attorney represented that all of Mr. Lefort's contact with Ms. Lefort was consensual and that this contact was actually permitted under the sentencing order. At the hearing, the Court was provided with Ms. Lefort's May 24, 2013 letter. Mr. Lefort's counsel represented that the Court had acted on the June 10, 2013 Letter and approved the request to

7

modify the Sentence Order from a no contact order to a no unlawful contact order. No one informed the Court that the Sentence Order was not actually modified in response to the June 10, 2013 Letter. At the end of the hearing, the Court dismissed the violation.

24. On December 17, 2013, the Board of Parole dismissed the violation based on the December 13, 2013 ruling of the Court.

25. Probation and Parole does not have control over the hearing calendars of the Court or the Board of Parole.

26. At the Hearing, the Court asked Mr. Lefort's counsel of any facts in the record that support the claims in the Response that Mr. Rahe and/or Ms. Keough had a past negative history with Mr. Lefort or violated Mr. Lefort due to malice or personal spite. Mr. Lefort's counsel responded that Mr. Lefort testified that he believed Mr. Rahe disliked him. Also, Mr. Lefort's counsel said there was "hidden animus" held by Mr. Rahe. No facts were provided to the Court from the record that supported the claim of "hidden animus."

## DISCUSSION

Through 42 *U.S.C.* § 1983, Mr. Lefort asserts claims against Mr. Rahe and Ms. Keough for unlawful arrest under the Fourth Amendment. The Fourth Amendment prohibits a law enforcement officer from arresting a citizen except upon probable cause.[7] A probation officer in Delaware may arrest a probationer when there is probable cause to believe the probationer is in violation of probation.[8] "The probable cause standard is a practical, nontechnical concept that must be measured by the totality of the circumstances."[9] As the Delaware Supreme Court has held, the standard for probable cause is a case by case review of the factual and practical considerations of everyday life "on which reasonable and prudent men, not legal technicians

---

[7] *See Presley v. Morrison*, 950 F. Supp. 1298, 1302 (E.D. Pa. 1996).
[8] *See McAllister v. State*, 807 A.2d 1119, 1124 (Del. 2002); *Woody v. State*, 765 A.2d 1257, 1265 (Del. 2001).
[9] *McAllister*, 807 A.2d at 1124; *see also Thompson v. State*, 539 A.2d 1052, 1055 (Del. 1988).

8

act."[10]  In a criminal matter, the Court looks at the facts the officer had and determined whether the officer had probable cause to arrest.[11]  In a civil action, it is a mixed question of fact and law whether there is probable cause.[12]  A jury decides disputed facts and the Court decides whether there was probable cause.[13]  After viewing the record in a light most favorable to Mr. Lefort, the Court finds that there are no genuine issues of material fact and that Mr. Rahe and Ms. Keough are entitled to judgment as a matter of law because Mr. Rahe had probable cause to arrest Mr. Lefort on a violation of probation on August 6, 2013.

Mr. Lefort relies too heavily on the fact that the Court eventually dismissed Mr. Lefort's violation.  While dismissing the violation, the record does not demonstrate that the Court ever held that Mr. Rahe lacked probable cause to violate Mr. Lefort.  Instead, the Court heard from counsel, reviewed the May 24, 2013 letter and, without much explanation, dismissed the violation.

The actual facts in this case provide that the Sentencing Order was less than clear as to how contact could occur between Mr. Lefort and Ms. Lefort.  Mr. Lefort consistently refers to the Sentencing Order as a "no unlawful contact" order.  The Court does not agree with this characterization of the terms and conditions of the Sentencing Order.  The Court has the ability to enter a sentencing order that contains the specific term entitled "no unlawful contact."  The Sentencing Order does not contain that language.  As entered, the Sentencing Order is a "no contact" order unless contact is allowed by "family court order" or by consent of Ms. Lefort.

Other persons believed that the Sentencing Order was a "no contact order."  Ms. Lefort thought it was a "no contact order" and asked the DAG to request a modification of the

---

[10] *McAllister*, 807 A.2d at 1124; *see also Hovington v. State*, 616 A.2d 829, 833 (Del. 1992).
[11] *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).
[12] *Quartarone v. Kohl's Department Stores, Inc.*, 983 A.2d 949, 958 (Del. Super. 2009).
[13] *Id.*

9

Sentencing Order in her letter dated May 24, 2013.  The DAG also thought it was a "no contact order" when the DAG petitioned the Court to modify the Sentencing Order through the June 10, 2013 Letter.  There would have been no need to modify the Sentencing Order to a "no unlawful contact order" if the Sentencing Order, in the first instance, provided for "no unlawful contact." Importantly, the Court never actually modified the Sentencing Order because the Court had not entered the modification before the request to modify was withdrawn by the DAG on July 22, 2013 – also at the request of Ms. Lefort.

Therefore, on August 6, 2013, Mr. Rahe and Ms. Keough needed to assess the facts and circumstances to determine whether to arrest Mr. Lefort for a violation of probation.  The DOC Report provided that, while in prison, Mr. Lefort had difficulties coping with the fact that, after their separation and divorce, Ms. Lefort was dating other men.  The DOC Report also indicated that Mr. Lefort had "a long history of substance abuse, violence, criminal thinking, behaviors, is extremely impulsive."  Mr. Lefort had contact with Ms. Lefort since leaving prison on June 10, 2013.  Probation and Parole had noted police contact by Mr. Lefort on August 2, 2013.  On August 6, 2013, Mr. Lefort visited Ms. Catalano.  Mr. Lefort had no legitimate reason for visiting Ms. Catalano.  Mr. Lefort acted unusually and made inappropriate comments about Ms. Lefort's relationship with Ms. Catalano's brother, Mr. Russum.  Ms. Catalano considered Mr. Lefort's statements to her to be a threat against Mr. Russum and Ms. Lefort.  And, Ms. Catalano considered it enough of a threat to directly contact Mr. Rahe about the incident.

Mr. Rahe and Ms. Keough had no information that showed that Ms. Lefort had consented to contact with Mr. Lefort.  The May 24, 2013 letter by Ms. Lefort had not been shared with Probation and Parole.  When confronted with the fact that he had contact with Ms. Lefort, Mr. Lefort did not tell Mr. Rahe that Ms. Lefort had consented to contact.  Moreover, by this point in

10

time, it is no longer clear that Ms. Lefort still wanted to have contact with Mr. Lefort. Ms. Lefort had told the DAG that she no longer wanted the "no contact" portion of the Sentencing Order modified. Ms. Lefort also testified that as of the Delaware State Fair, she did not want to pursue any type of relationship with Mr. Lefort.

As stated above, the standard for probable cause is a case by case review of the factual and practical considerations of everyday life "on which reasonable and prudent men, not legal technicians act."[14] With Mr. Lefort's unusual and threatening conduct between August 2 and August 6, 2013, the fact that Mr. Lefort admitted contact with Ms. Lefort, and the form of the Sentencing Order, the Court finds no genuine issue as to a material fact exists on the question of whether probable cause existed for Mr. Lefort's arrest for a violation of probation.

The subsequent history of how Mr. Rahe handled the violation does not change the probable cause analysis. Mr. Rahe did first file the violation report with the Court. Upon discovering his mistake, Mr. Rahe withdrew the report and refiled it with the Board of Parole. Mr. Lefort did not exercise his right to a preliminary hearing and the matter was set for a decision by the Board of Parole. When that process became delayed, Mr. Rahe went back to the Court and obtained an earlier date for disposition. Mr. Rahe and Ms. Keough do not control the calendars of the Court or the Board of Parole. All of these facts come after Mr. Rahe and Ms. Keough determined that probable cause existed to arrest for a violation of probation. As such, the facts are not relevant to the issue of whether probable cause to arrest existed on August 6, 2013.

The Court also finds that Mr. Rahe and Ms. Keough are entitled to summary judgment because the objective reasonableness of the actions of Mr. Rahe and Ms. Keough entitle them to qualified immunity with regard to the 4th Amendment Claim. Probation and parole officers are

---

[14] *McAllister*, 807 A.2d at 1124.

11

entitled to qualified immunity for their non-adjudicatory – or discretionary – activities.[15]

Qualified immunity shields arresting officers from a suit for damages if a reasonable officer could have believed the arrest to be lawful, in light of clearly established law and the information the arresting officers possessed.[16] Even law enforcement officers who "reasonably but mistakenly conclude that probable cause is present" are entitled to qualified immunity.[17] The United States Supreme Court has stressed the importance of resolving immunity questions at the earliest stage of the litigation because qualified immunity is an immunity from suit rather than an affirmative defense.[18]

Under settled law, therefore, Mr. Rahe and Ms. Keough are entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest Mr. Lefort for a violation of probation. Moreover, Mr. Rahe and Ms. Keough would be entitled to qualified immunity even if they erred in concluding probable cause existed to arrest Mr. Lefort if their mistaken decision was reasonable.[19] According to the United States Supreme Court,

> The qualified immunity standard "gives ample room for mistaken judgments" by protecting all but the plainly incompetent or those who knowingly violate the law…This accommodation for reasonable error exists because "officials should not err on the side of caution" because they fear being sued.[20]

As discussed above, the facts in civil action – even when looked at in a light most favorable to Mr. Lefort – were sufficient to permit a prudent officer of reasonable caution to believe that Mr. Lefort had committed a violation of his parole and/or probation. Moreover, even if Mr. Rahe and Ms. Keough were mistaken about probable cause, the Court finds that Mr.

---

[15] *See, e.g., Presley*, 950 F. Supp. at 1304.
[16] *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991).
[17] *Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *see also Hunter*, 502 U.S. at 227.
[18] *Hunter*, 502 U.S. at 227.
[19] *Id.*
[20] *Id.* at 229.

Rahe and Ms. Keough would, nevertheless, be entitled to qualified immunity because their decision was reasonable, though mistaken.

## CONCLUSION

The Motion is **GRANTED**, and summary judgment is **ENTERED** in favor of Mr. Rahe and Ms. Keough on all claims asserted against them in the Complaint filed in this civil action.

**IT IS SO ORDERED.**

Dated: June 17, 2016
Wilmington, Delaware

/s/ *Eric M. Davis*
Eric M. Davis, Judge

13