# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

RAYMOND REED,                    )
                                 )
            Plaintiff,           )
                                 )
      v.                         )    C.A. No. N17C-10-366 EMD
                                 )
BNSF RAILWAY COMPANY, f/n/a      )
Burlington Northern and Santa Fe )
Railway Company,                 )
                                 )
            Defendant.           )

Submitted:  August 25, 2020
Decided: November 2, 2020

*Upon Defendant's Motion for Summary Judgment*
***DENIED***

A. Dale Bowers, Esquire, Law Office of A. Dale Bowers P.A., Wilmington, Delaware. *Attorney for Plaintiff Raymond Reed.*

Maria R. Granuado Gesty, Esquire, Burns White LLC, Wilmington, Delaware. *Attorney for Defendant BNSF Railway Company.*

**DAVIS, J.**

## I.      INTRODUCTION

This civil action arises from claims made by Plaintiff Raymond Reed against Defendant BNSF Railway Company, f/k/a Burlington Northern and Santa Fe Company ("BNSF") under the Federal Employer's Liability Act ("FELA"), 45 U.S.C. §§ 51 *et. seq.*  Mr. Reed filed his Complaint on October 30, 2017.  Mr. Reed contends that BNSF negligently exposed Mr. Reed to "various toxic substances and carcinogens including but not limited to: diesel fuel/exhaust, benzene, creosote, and rock/mineral dust and asbestos fibers."[1]  BNSF filed an answer with affirmative defenses on September 26, 2018.

---
[1] Compl. ¶7.

On June 9, 2020, BNSF filed its Motion for Summary Judgment of Defendant BNSF Railway Company (the "Motion"). BNSF seeks summary judgment in its favor under a Settlement and Release Agreement (the "Release") entered into by Mr. Reed and BNSF on August 22, 2000. BNSF contends that Mr. Reed previously released the claims made in the Complaint through the Release. On July 6, 2020, Mr. Reed filed his Plaintiff's Response in Opposition to Defendant, BNSF Railway Company's Motion for Summary Judgment (the "Response"). Mr. Reed opposes summary judgment and argues that: (i) the Release is not valid under FELA; and (ii) the Release, viewed in a light most favorable to Mr. Reed, creates a genuine issue of material fact. BNSF filed a reply. The Court held a hearing on the Motion on August 24, 2020. At the conclusion of the hearing, the Court took the Motion under advisement.

For the reasons set forth below, the Court will **DENY** the Motion.

## II. FACTUAL BACKGROUND[2]

Mr. Reed previously sued BNSF in 1999. Mr. Reed filed a workplace injury complaint against the company in the United States District Court for the District of Washington, *Raymond L. Reed v. Burlington Northern and Santa Fe Railway Co.*, C.A. No. C99-131RM (the "Initial Litigation").[3] In 2000, the parties reached a settlement of the Initial Litigation.[4] Under the settlement, Mr. Reed accepted $166,000 and promised to end his employment with BNSF.[5]

Mr. Reed executed the Release as part of the settlement.[6] The Release is four pages long, and was signed by Mr. Reed and two witnesses on August 22, 2000.[7] An attorney represented Mr. Reed with respect to the Release.[8] The Release is broad and appears to address three types

---

[2] Unless otherwise stated, the Court is utilizing facts as set out in the Motion and the Response.
[3] Mot. at ¶2; Ex. A at ¶1.C.
[4] *Id.*
[5] *Id.*
[6] Mot., Ex. A.
[7] *Id.* at 4.
[8] *Id.* at ¶7.

of claims: (i) claims in the Initial Litigation;[9] (ii) retirement and seniority rights;[10] and (iii) future claims.[11] Paragraph 1.B of the Release provides:

> Any and all claims, whether know or unknown, including, but not limited to illness, injuries or damages resulting from alleged exposure to noise, smoke, fumes, dust, gases, chemicals, fibers, or any type of exposure, or any accident, incident, trauma (cumulative or otherwise), mental or emotional stress, including but not limited to post-traumatic stress disorder, post-concussive syndrome, closed head (brain) injuries, cognitive defects or psychological symptoms, or any other claims relating to any employment practices, labor claims, claims under state law for employment discrimination, claims under the Railway Labor Act, claims under the American with Disabilities Act, or any similar state or federal law, or any other claims resulting from or arising from my employment with [BNSF], including any claim for present or future reinstatement which I hereby expressly waive and release.[12]

BNSF deposed Mr. Reed on March 12, 2000.[13] During the deposition, BNSF asked Mr. Reed questions concerning the Release.[14] BNSF asked Mr. Reed if he signed the Release containing Paragraph 1.B.[15] Mr. Reed responded with a one-word answer, "Evidently."[16] The questioning continued as follows:

Q:      So you understand, Mr. Reed, that by signing [the Release], you were giving up your rights to sue [BNSF] for exposure to fumes, dust, chemicals, and any diseases known or unknown that may arise?

[Mr. Reed's Counsel]: Objection. Calls for a legal conclusion. I would instruct my client not to answer that.

Q:      Do you understand that's what the [Release] says? You can answer the question.

[Mr. Reed's Counsel]: You can answer if - -

[Mr. Reed]: Oh

---

[9] *Id*, at ¶¶1.A and 1.C
[10] *Id*. at ¶¶4-5.
[11] *Id*. at ¶1.B.
[12] *Id*. at 1.B.
[13] Mot. at Ex. B.
[14] *Id*. at 55:1-56:18.
[15] *Id*. at 53:22-54:10.
[16] *Id*. at 54:21.

3

[Mr. Reed's Counsel]: - - if you read the release accurately.

[Mr. Reed]: Yeah, I read it accurately.

Q:      Okay.  But, nonetheless, you brought a lawsuit for exposure to chemicals, fumes, et. cetera; right?

A:      Yeah.

Q:      Is that right?

A:      That's right.

[Mr. Reed]:  Would it be inappropriate for me to say something now?

[Mr. Reed's Counsel]:  No.  Just wait until another question.

[Mr. Reed]:  Okay.

Q:      So what did you want to say, Mr. Reed?

A:      Nothing right now.

Q:      All right.  But you - - you signed this release, and you said you understood the terms when you signed it; right?

A:      I just signed it.

Q:      Well - -

A:      I said I did but I just signed it.

Q:      Do you understand it now?

A:      It - - yes.[17]

In this present action, Mr. Reed alleges that, while he was a BNSF employee, BNSF negligently exposed him to toxic substances that caused his lung cancer.[18]

---

[17] *Id*. at 55:5-56:18.
[18] Compl. at ¶¶7, 11-12, 14-17.

### III. PARTIES' CONTENTIONS

#### A. BNSF

BNSF contends that summary judgment is appropriate because "there are no material facts in dispute as to whether [Mr. Reed] previously released his claims against BNSF for occupation exposure to toxic substances."[19] BNSF highlights the fact that Mr. Reed indicated his assent to be bound by the Release by signing it and later reaffirming his understanding of it in his 2020 deposition. In support, BNSF relies upon *Loyal v. Norfolk Southern Ry. Co.*[20] The court, in *Loyal*, upheld a prior in time executed release in a subsequent FELA action.

BNSF urges the Court to adopt the "known risk" test set forth in *Wicker v. Consolidated Rail Corp.*[21] In *Wicker*, the Third Circuit Court of Appeals held that a release may be enforced in a subsequent FELA action if "(1) the release is executed for valid consideration as part of a settlement; and (2) the scope of the release is limited to those risks that plaintiff knows of at the time of the settlement."[22] BNSF contends that Mr. Reed knew he was releasing future claims like the one asserted in the Complaint because the types of claims were enumerated in the Release. Furthermore, BNSF states that the Release is supported by consideration, including $166,000 paid by BNSF to Mr. Reed. BNSF therefore believes that both elements of the "known risk" test have been satisfied. Lastly, BNSF distinguishes the Release from a "boilerplate" release (an element addressed by the *Wicker* court) by explaining that the Release was carefully negotiated by represented parties.

---

[19] Mot. at ¶2.
[20] 507 S.E. 2d 499 (Ga. Ct. App. 1998).
[21] 142 F.3d 690 (3d Cir. 1998).
[22] Mot. at ¶8 (quoting *Wicker*, 142 F.3d at 701).

5

### B. MR. REED

Mr. Reed opposes the Motion. Mr. Reed argues that the Release was only relevant to his previous open head injury. Mr. Reed recognizes that there is "a split of authority…as to the enforceability of broadly written releases under § 5 [of FELA];"[23] however, Mr. Reed contends that the Release at issue is unenforceable. Mr. Reed relies upon *Babbitt v. Norfolk & W. Ry. Co.*[24] Mr. Reed notes that under *Babbitt*, "a release is only valid for the specific injury at issue and cannot go beyond that specific injury to any other injury or condition that may later develop."[25]

Mr. Reed also cites to *Wicker*. Mr. Reed contends that under *Wicker*, "where a release merely details a laundry list of diseases or hazards, the employee may attack that release as boiler plate, not reflecting his or her intent."[26] Mr. Reed claims that *Wicker* held that releases are unenforceable when the individuals did not know of the specific risks released.

## IV. STANDARD OF REVIEW

The standard of review on a motion for summary judgment is well settled. The Court's principal function when considering a motion for summary judgment is to examine the record to determine whether genuine issues of material fact exist, "but not to decide such issues."[27] Summary judgment will be granted if, after viewing the record in a light most favorable to a nonmoving party, no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.[28] If, however, the record reveals that material facts are in dispute, or if the factual record has not been developed thoroughly enough to allow the Court to apply the

---

[23] Pl.'s Resp. at ¶ 7.
[24] 104 F.3d 89 (6th Cir. 1997).
[25] Pl.'s Resp. at ¶ 8 (referencing *Babbitt,* 104 F.3d at 91-93).
[26] *Id.* at ¶ 9 (quoting *Wicker*, 142 F.3d at 701).
[27] *Merrill v. Crothall-American Inc.*, 606 A.2d 96, 99-100 (Del. 1992) (internal citations omitted); *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*, 312 A.2d 322, 325 (Del. Super. 1973).
[28] *Id.*

6

law to the factual record, then summary judgment will not be granted.[29]  The moving party bears

the initial burden of demonstrating that the undisputed facts support his claims or defenses.[30]  If

the motion is properly supported, then the burden shifts to the non-moving party to demonstrate

that there are material issues of fact for the resolution by the ultimate fact-finder.[31]

## V.     DISCUSSION

The validity of a release under FELA raises a federal question to be determined by

federal law.[32]  The party attacking a FELA release bears the burden of establishing that the

release is invalid.[33]  Congress sought to prevent railroad employers from contracting out of

FELA liability by passing 45 U.S.C. § 55 (referred to as § 5 of FELA), as many railroads had

insisted on contracts with their employees that discharged the company from liability for

personal injuries.[34]  Section 5 of FELA provides, in relevant part:

> Any contract, rule, regulation, or device whatsoever, the purpose or intent of
> which shall be to enable any common carrier to exempt itself from any liability
> created by this chapter, shall to that extent be void ....[35]

Mr. Reed argues that the Release executed by Mr. Blackmon is unenforceable due to § 5 of

FELA.

Despite the seemingly broad language of this section, the United States Supreme Court

made clear long ago that releases are not *per se* invalid under § 5 of FELA.  In *Callen v.*

---

[29] *See Ebersole v. Lownegrub*, 180 A.2d 467, 470 (Del. 1962); *see also Cook v. City of Harrington*, 1990 WL 35244, at *3 (Del. Super. Feb. 22, 1990) (citing *Ebersole*, 180 A.2d at 467) ("Summary judgment will not be granted under any circumstances when the record indicates . . . that it is desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.").

[30] *See Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1970) (citing *Ebersole*, 180 A.2d at 470).

[31] *See Brzoska v. Olsen*, 668 A.2d 1355, 1364 (Del. 1995).

[32] *Dice v. Akron, C. & Y. R.R. Co.,* 342 U.S. 359, 361 (1952)

[33] *See, e.g., Jaqua v. Canadian Nat. R.R., Inc.,* 734 N.W.2d 228, 232 (Mich.Ct.App.2007); *Loyal v. Norfolk Southern Corp.,* 507 S.E.2d 499, 504 (Ga.Ct.App.1998).

[34] *Wicker,* 142 F.3d at 696 (citing to H.R. Rep. 1386, 60th Cong. 1st Sess. 6 (1908)).

[35] 45 U.S.C. § 55.

7

*Pennsylvania Railroad Co.,*[36] a railroad employee executed a release when he settled a claim

against the railroad arising out of a back injury. In exchange for $250, the employee released all

claims and demands against the railroad that the employee had at that time, or could have in the

future, for injuries sustained in an alleged accident.[37] The employee later filed a FELA action

based on the back injury he sustained in the accident. He acknowledged that he read and

understood the release, knew what he was doing, and intended to waive any further claim.[38]

However, he argued that the release violated § 5 of FELA because it enabled the railroad to

"exempt" itself from liability.[39] The United States Supreme Court dismissed this argument

without much discussion, simply stating:

> It is obvious that a release is not a device to exempt from liability but is a means
> of compromising a claimed liability and to that extent recognizing its possibility.
> Where controversies exist as to whether there is liability, and if so for how much,
> Congress has not said that parties may not settle their claims without litigation.[40]

*Cullen* clarifies that "a release of FELA claims can have the same effect as any other

release, in that it may constitute a settlement or compromise, rather than an attempt to escape

liability."[41]

As mentioned above, the Third Circuit Court of Appeals considered the validity of FELA

releases in *Wicker*. In *Wicker,* the plaintiff employees had executed releases in the past in

connection with the settlement of claims for various injuries, such as asbestos-related injuries

and back injuries.[42] The releases purported to release the railroad from liability for all injuries,

past and future, relating to their employment.[43] The plaintiffs then sued under FELA, alleging

---

[36] 332 U.S. 625, 626–27, (1948).
[37] *Id*.
[38] *Id*. at 627.
[39] *Id*. at 630-31.
[40] *Id*. at 631.
[41] *Babbitt,* 104 F.3d at 92 (citing *Callen*).
[42] 142 F.3d at 692-93.
[43] *Id*. at 693.

that they were injured by exposure to hazardous and toxic substances during their employment.[44]

The plaintiffs argued that the general releases they executed were void pursuant to § 5 of FELA.

The plaintiffs contended that a FELA release could only compromise a claimed liability, and

therefore, it could not release claims they did not know existed.[45] They claimed they were

unaware of their present injuries at the time of the releases, and they offered supporting affidavits

from the attorneys who represented them at the time.

At the outset, the *Wicker* Court recognized that, according to *Callen,* releases are not *per se* invalid under FELA.[46] The Court said that although the *Callen* Court did not explain what

will qualify as a permissible "compromise" of a claimed liability, "it did say that parties may

settle '[w]here controversies exist as to whether there is liability, and if so for how much.' The

explicit requirement is that a controversy must exist."[47]

The *Wicker* court surveyed other decisions since *Callen* and noted that the courts had

varying results—some held that general releases of all claims did not contravene the purposes of

FELA and could bar a subsequent claim, while others had refused to enforce them.[48] The *Wicker*

court acknowledged the Sixth Circuit's recent holding in *Babbitt* that "appear[ed] to establish a

broad, legal rule prohibiting the use of general releases in cases such as this."[49] The *Wicker*

court noted that the releases in *Babbitt* were executed as part of an early retirement program,

offered to all employees on a take-it-or-leave-it basis, rather than the result of a compromise of

claims.[50] In *Wicker*, however, "the releases…were all negotiated as part of the settlement of an

existing claim—each was the result of arms-length bargaining between the plaintiff, his counsel,

---

[44] *Id*. at 694.
[45] *Id*. at 695.
[46] *Id*. at 697.
[47] *Id*.
[48] *Id*. at 699.
[49] *Id*.
[50] *Id*.

and the defendant railroad."[51] In order to be valid, a FELA release "…must at least have been executed as part of a negotiation settling a dispute between the employee and the employer."[52] The *Wicker* court explained that FELA cases are inherently fact-bound, and "[t]he evaluation of the parties' intent at the time the agreement was made is an essential element of this inquiry."[53] "[T]he 'meaning to be given to the words of a contract must be the one that carries the intent of the parties as determined by the circumstances under which the contract was made.' "[54]

After extensively reviewing additional relevant case law, the *Wicker* court concluded, "[t]he question remains whether there is a way to protect employees' statutory rights while also upholding the parties' right to settle claims by contract."[55] *Id.* The Court explained its decision as follows:

> A bright line rule like the one set forth in *Babbitt,* limiting the release to those injuries known to the employee at the time the release is executed, has the benefit of predictability. Under *Babbitt,* "a release must reflect a bargained-for-settlement of a known claim for a specific injury, as contrasted with an attempt to extinguish potential future claims the employee might have arising from injuries known or unknown by him." 104 F.3d at 93.
>
> Yet, it is entirely conceivable that both employee and employer could fully comprehend future risks and potential liabilities and, for different reasons, want an immediate and permanent settlement. The employer may desire to quantify and limit its future liabilities and the employee may desire an immediate settlement rather than waiting to see if injuries develop in the future. To put it another way, the parties may want to settle controversies about potential liability and damages related to known risks even if there is no present manifestation of injury.
>
> The question still remains whether a rule allowing parties to release claims related to known risks rather than known injuries reflects FELA's remedial goals. We believe it does. We hold that a release does not violate § 5 provided it is executed for valid consideration as part of a settlement, and the scope of the release is limited to those risks which are known to the parties at the time the release is signed. Claims relating to unknown risks do not constitute "controversies," and

---

[51] *Id.*
[52] *Id.* at 700.
[53] *Id.*
[54] *Id.* (quoting *Forry, Inc. v. Neundorfer, Inc.,* 837 F.2d 259, 263 (6th Cir.1988)).
[55] *Id.*

10

may not be waived under § 5 of FELA. See *Callen*, 332 U.S. at 631, 68 S.Ct. at 298–99. For this reason, a release that spells out the quantity, location and duration of potential risks to which the employee has been exposed—for example toxic exposure—allowing the employee to make a reasoned decision whether to release the employer from liability for future injuries of specifically known risks does not violate § 5 of FELA.

To the extent that a release chronicles the scope and duration of the known risks, it would supply strong evidence in support of the release defense. But we are wary of making the validity of the release turn on the writing alone because of the ease in writing detailed boiler plate agreements; draft releases might well include an extensive catalog of every chemical and hazard known to railroad employment. For this reason, we think the written release should not be conclusive. We recognize that what is involved is a fact-intensive process, but trial courts are competent to make these kinds of determinations. While the elusiveness of any such determination might counsel in favor of a bright-line rule such as the Sixth Circuit adopted in *Babbitt,* we decline to adopt one here.

Instead, we conclude that a release may be strong, but not conclusive, evidence of the parties' intent. Where a specific known risk or malady is not mentioned in the release, it would seem difficult for the employer to show it was known to the employee and that he or she intended to release liability for it. Furthermore, where a release merely details a laundry list of diseases or hazards, the employee may attack that release as boiler plate, not reflecting his or her intent. We recognize that this is a different (and more difficult) standard for railroad employers than is typical in non-FELA situations, but given the Supreme Court's pro-employee construction of the FELA, [citations omitted], we adopt it.[56]

Applying these standards to the releases before it, the *Wicker* court found each of the releases invalid.[57] Even though the releases were executed in the context of settling previous claims, the issue of the parties' intent was problematic.[58]

The language of the *Wicker* releases appeared to recite standard waiver of liability provisions, which did not demonstrate that the parties understood, addressed or discussed the scope of the waived claims. The record failed to indicate whether the parties negotiated any part of the releases other than the settlement amount. Some of the releases were detailed broad releases that attempted to cover all potential liabilities, reciting a series of generic hazards rather

---

[56] *Id*. at 700-01.
[57] *Id*. at 701.
[58] *Id*.

than specific risks the employees faced during the course of their employment. For example, some of the releases referenced injuries from "dust, fumes, vapors, mists, gases, agents, asbestos or toxic substances of any kind."[59] However, the releases did not demonstrate the employees knew of the actual risks to which they were exposed and from which the employer was being released.[60] In fact, the plaintiffs testified that they were not aware of the associated risks of the chemicals used at their employer's facility.[61]

The *Wicker* court, therefore, found no evidence that the plaintiffs, "despite being represented by counsel," were aware of the potential health risks to which they had been exposed.[62] The *Wicker* court held that the releases violated FELA because they purported to settle all claims regardless of whether the parties knew of the potential risks.[63] It appears that, under *Wicker,* "a valid release may encompass an injury that is unknown at the time of its execution, if the possibility of such injury is known."[64]

The Court adopts the test set out in *Wicker.* This mean the Release is strong, but not conclusive, evidence of the parties' intent. The Release, however, does not detail specific known risks or maladies. Much of the Release seems to use "boilerplate" language.[65] The Court has been presented with no facts showing that the parties negotiated any part of the releases other than the settlement amount. As such, BNSF argument that the Release was intended to release the specific claims asserted in the Complaint seems factually incomplete. The Court also notes that Mr. Reed testified that he was aware of the terms and conditions of the Release. Moreover,

---

[59] *Id*. at 693.
[60] *Id*. at 701.
[61] *Id*. at 702.
[62] *Id*.
[63] *Id*.
[64] *Loyal,* 234 Ga.App. at 701, 507 S.E.2d at 502.
[65] *Wicker*, 142 F.3d 690, 701 (3d. Cir. 1998).

the Release seems to address a situation where BNSF and Mr. Reed were trying to settle all claims at one time—the Initial Litigation, retirement/seniority claims and future claims.

On this record, the Court finds that there are too many factual disputes regarding the Release to grant summary judgment in favor of BNSF. Accordingly, the Court denies the Motion. The Court, however, will allow BNSF to use the Release at trial and to argue that the Release constitutes a defense to the Complaint's claims.

## VI. CONCLUSION

For the reasons set forth above, the Motion is **DENIED**.

**IT IS SO ORDERED**

Dated: November 2, 2020
Wilmington, Delaware

*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc:     File&ServeExpress

13