**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| THE BOEING COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.: N14C-12-055 EMD CCLD |
| | ) | |
| SPIRIT AEROSYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

Submitted: March 22, 2017
Decided: June 27, 2017

*Upon Plaintiff The Boeing Company's Motion for Summary Judgment*
***DENIED***

*Upon Defendant-Counterclaim Plaintiff Spirit Aerosystems, Inc.'s*
*Motion for Summary Judgment*
***GRANTED***

William M. Lafferty, Esquire, John P. DiTomo, Esquire, Barnaby Grzaslewicz, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, Craig S. Primis, Esquire, Michael A. Glick, Esquire, Tracie L. Bryant, Esquire, Kirkland & Ellis LLP, Washington, DC, Eric F. Leon, Equire, Kirkland & Ellis, New York, New York, *Attorneys for Plaintiff The Boeing Company*

John A. Sensing, Esquire, Jesse L. Noa, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware, Evan R. Chesler, Esquire, Darin P. McAtee, Esquire, Timothy G. Cameron, Esquire, J. Wesley Earnhardt, Esquire, Caravath, Swaine & Moore LLP, New York, New York, *Attorneys for Defendant-Counterclaim Plaintiff Spirit Aerosystems, Inc.*

**DAVIS, J.**

## I. INTRODUCTION

This civil action is assigned to the Complex Commercial Litigation Division of the Court.

On December 5, 2014, Plaintiff The Boeing Company ("Boeing") filed a Complaint (the

"Complaint") against Defendant Spirit Aerosystems, Inc. ("Spirit") for Breach of Contract and

Declaratory Judgment. Through the Complaint, Boeing seeks a declaration that Spirit breached its indemnification obligation for liabilities arising out of certain pension and retiree medical benefits. Spirit argues that it has no indemnification obligation to Boeing because the liabilities at issue arose out of Boeing's Collective Bargaining Agreements, not Boeing's pension and retiree medical benefits. On September 25, 2015, Spirit answered the Complaint and asserted counterclaims against Boeing for Breach of Contract and Declaratory Judgment. Spirit seeks a declaration that Boeing must indemnify Spirit for the costs associated with this and other legal proceedings. Boeing answered Spirit's counterclaims.

On December 20, 2016, the parties filed cross-motions for summary judgment (respectively, "Boeing's Motion" and "Spirit's Motion" and collectively, the "Motions."). The Motions seek summary judgment on the Breach of Contract and Declaratory Judgment counts based on the parties' differing characterization of the liabilities at issue. The Court held a hearing on the Motions on March 22, 2017. At the hearing, the parties advised the Court that no genuine issues of material fact existed. After hearing argument, the Court took the Motions under advisement. The Court also took this civil action off the trial calendar as both parties agreed that the various disputes between the parties would be resolved by the Motions.

This is the Court's decisions on the Motions. For the reasons set forth below, the Court will **DENY** Boeing's Motion and **GRANT** Spirit's Motion.

## II. RELEVANT FACTS

A.   BOEING DIVESTS ITS MANUFACTURING FACILITIES

Boeing's business consists of the design, manufacturing, and sale of commercial jetliners and military aircrafts.[1] In 2003, Boeing began divesting some of its commercial aircraft part

---

[1] Compl. ¶ 10.

2

manufacturing facilities to third-party manufacturers.[2]  Under this divestiture strategy, Boeing

would sell its manufacturing plants to third-party manufacturers, but would retain supply

agreements with the buyers to obtain necessary parts.[3]   In June of 2005, Boeing sold its

manufacturing facilities in Wichita, Kansas and Tulsa and McAlester, Oklahoma (the "Kansas

and Oklahoma facilities") to Spirit.[4]  The parties memorialized the sale through an Asset

Purchase Agreement (the "APA").[5]

## B.      THE APA

The APA is a sophisticated agreement.  As part of the APA, Boeing and Spirit

apportioned certain assets and liabilities related to the employees working at the Kansas and

Oklahoma facilities.[6]  The APA defines Spirit as the "Buyer" and Boeing as the "Seller."[7]  For

purposes of this litigation, the relevant assets and liabilities are Boeing's collective bargaining

agreements ("CBAs") and Boeing's benefit plans, including pension and retiree medical

benefits.[8]

The APA is "governed by and construed in accordance with the internal Laws (as

opposed to the conflicts of Law provisions) of the State of Delaware."[9]

### i.     The Assets and Excluded Assets

Section 1 of the APA governs the purchase and sale of assets.  Section 1.1(a)-(b) outlines

the Assets and Excluded Assets related to the purchase and sale of the Kansas and Oklahoma

facilities.[10]  Under Section 1.1(a), the Assets purchased by Spirit include:

---

[2] *Id.* ¶ 12.
[3] *Id.*
[4] *Id.* ¶ 14.
[5] *Id.*
[6] *See* Compl. Ex. A, Asset Purchase Agreement. Ex. A to the Complaint will be cited as "APA § __."
[7] *See* APA at p. 1.
[8] The two Boeing benefit plans at issue in this litigation are The Boeing Company Employee Retirement Plan and the Boeing North American Retirement Plan for Eligible Employees, both of which will be cited throughout this Opinion as "Boeing's Benefit Plans."
[9] APA §  11.13.

(v)     All Contracts primarily related to the Business other than with regard to third-party customers and subject to the provisions of Section 5.2(d) and 5.2(e) (the "Assigned Contracts"), including but not limited to the Contracts set forth on Schedule 1.1(a)(v), but not including the Contracts described in Section 1.1(b);

(viii)     Assets of Seller related to Benefit Plans to the extent provided in Section 6.2.[11]

Under Section 1.1(b), the Excluded Assets, or those not "conveye[d], assign[ed], or transfer[ed]" to Spirit, include:

(xi)     Assets of Seller related to all Benefit Plans, except as set forth in Section 6.2;

(xiii)     The existing collective bargaining agreements covering the employees of the Business.[12]

Section 1.1(a)-(b) makes it clear what Spirit purchased from Boeing, with Section 1.1(a) specifically listing the included assets and Section 1.1(b) specifically listing the excluded assets.[13]

## ii.     The Assumed Liabilities and Excluded Liabilities

Section 1.2 of the APA governs the assumption of liabilities by Spirit. Section 1.2(a)-(b) explicitly allocates liability between Spirit and Boeing.[14] Section 1.2(a) lists the liabilities assumed by Spirit—defined in the APA as Assumed Liabilities.[15] The Assumed Liabilities include:

(ii)     Liabilities arising after the Closing under the Assigned Contracts (other than Liabilities arising out of or relating to any act or omission that occurred prior to the Closing);

---

[10] *See* APA § 1.1(a)-(b).
[11] *Id.* § 1.1(a).
[12] *Id.* § 1.1(b).
[13] *See id.* § 1.1(a)-(b).
[14] *See id.* § 1.2(a)-(b).
[15] *Id.* § 1.2(a).

(iii)    Liabilities of Seller arising after the Closing under any Assigned Contract included in the Assets that is entered into by Seller after the date hereof in accordance with the provisions of this Agreement (other than Liabilities to the extent arising out of or relating to any at or omission that occurred prior to the Closing);

(iv)    Liabilities for pension Liability, Accrued Vacation, retiree medical flexible spending accounts, sick leave, and personal time to the extent provided in Section 6.2.[16]

Section 1.2(b) lists the Excluded Liabilities, or those "retained, paid, performed, and discharged solely by" Boeing:

(iv)    Liabilities of Seller related to all Benefit plans, except as set forth in Section 6.2;

(xiii)   Liabilities under any Contract not assumed by Buyer under Section 1.2(a), including Liabilities arising out of or relating to Seller's credit facilities or any security interest related thereto.[17]

Just like in Section 1.1(a)-(b), Section 1.2(a)-(b) makes it clear that Spirit shall not assume any liabilities other than those specifically set forth in Section 1.2(a).[18]

### iii.    *Pension and Retiree Medical Benefits*

Section 6.2 goes on to clarify the parties' obligations related to employee benefit plans as referenced throughout Sections 1.1 and 1.2.[19]  Section 6.2(a) establishes procedures for hiring former Boeing employees, referred to under the APA as "Hired Employees."[20]  With respect to these Hired Employees, Spirit must:

(i) provide compensation and levels of benefits under any Benefit Plan Buyer establishes for the Hired Employees ("Buyer's Benefit Plans") as determined by Buyer and (ii) credit periods of service prior to the Closing for purposes of determining eligibility (and benefit entitlement with respect to vacations and pension benefits pursuant to Sections 6.2(d) and 6.2(f)) under Buyer's Benefit Plans so long as Seller furnishes Buyer will all information necessary to

---

[16] *Id.* § 1.2(a).
[17] *Id.* § 1.2(b).
[18] *See id.* § 1.2(a)-(b).
[19] *See id.* § 6.2.
[20] *Id.* § 6.2(a).

implement this subsection 6.2(a)(ii) pursuant to the other provisions of this Agreement.[21]

Section 6.2(f) then requires Spirit to "establish or maintain" three separate union and non-union pension plans for the Hired Employees, specifying that the pension plans must:

> . . . include credit for Hired Union Employees and Hired Non-Union Employees' past service with Seller for eligibility and vesting and, contingent upon the transfer of assets in accordance with this Section 6.2(f), early retirement benefits and benefit accrual previously recognized under Seller's Pension Plans . . . Buyer's Pension Plans shall further include, indefinitely, credit for Hired Union Employees' and Hired Non-Union Employees' service with Buyer for eligibility, vesting, and early retirement.[22]

Section 6.2(f) concludes by assigning liability for pension plan benefits as follows:

> Buyer's Pension Plans shall be liable for benefits with respect to service recognized under Seller's Pension Plans on or prior to the Closing Date with respect to the Hired Union Employees and Non-Union Employees, contingent upon the transfers of assets in accordance with this Section 6.2(f). Buyer agrees that neither Seller nor Seller's Pension Plans shall have any further responsibility with respect to the assets and Liabilities so transferred, including without limitation, obligations following such transfers with respect to the benefits accrued by the Hired Union Employees and Hired Non-Union Employees under the applicable Seller's Pension Plans.[23]

Finally, similar to Section 6.2(f), Section 6.2(g) requires Spirit to also "maintain" certain retiree medical benefits, specifying that:

> . . . Buyer shall be responsible for and shall maintain retiree medical coverage for the benefit of each Hired Employee who was eligible for or could have become eligible for (after meeting applicable age and service requirements) retiree medical coverage maintained by Seller and who is not receiving retiree medical benefits from Seller, and shall provide each such Hired Employee full credit for periods of service prior to the Closing . . . subject to the provisions of any collective bargaining agreements between Buyer and the unions.[24]

Section 6.2(g) concludes by assigning liability as follows:

---

[21] *Id.*

[22] *Id.* § 6.2(f).

[23] *Id.*

[24] *Id.* § 6.2(g).

Buyer agrees that Seller and its retiree medical plans shall have no further responsibilities after the Closing Date to provide to such Hired Employees retiree medical benefits. This Agreement does not limit Buyer's ability to make changes in or amendments to any Buyer retiree medical plan following the Closing.[25]

### iv.    *Indemnification Obligations*

After apportioning and clarifying liability, the APA provides certain indemnification rights to each party.[26] Under Section 9.1(a), Boeing must indemnify Spirit for:

> . . . any and all losses, Liabilities, damages, costs and expenses, including costs of investigation and defense and reasonable fees and expenses of lawyers, experts and other professionals (collectively, "Indemnifiable Damages"), incurred by such Buyer Group Member in connection with or arising from: (i) any breach of any warranty or the inaccuracy of any representation of Seller contained in this Agreement . . . , (iii) any breach by Seller of, or failure by Seller to perform, any of its covenants or obligations contained in this Agreement, (iv) the Excluded Liabilities . . . .[27]

Under Section 9.2(a), Spirit must indemnify Boeing for:

> . . . any and all Indemnifiable Damages incurred by such Seller Group Member in connection with or arising from: (i) any breach of warranty or the inaccuracy of any representation of Buyer contained in this Agreement . . . , (ii) any breach by Buyer of, or failure by Buyer to perform, any of its covenants and obligations contained in this Agreement, (iii) the Assumed Liabilities . . . .[28]

As to indemnification for liabilities, Spirit must indemnify Boeing for its Assumed Liabilities, and Boeing must indemnify Spirit for the Excluded Liabilities under the terms of the APA.[29]

## C.    BOEING DECIDES TO "TERMINATE" THE HIRED EMPLOYEES

After the parties executed the APA, Boeing announced that former employees of Boeing hired by Spirit (the "Hired Employees") would be "terminated due to divestiture" rather than "laid off" from Boeing.[30] Boeing then transferred to Spirit's pension fund the assets in the Hired

---

[25] *Id.*
[26] *See id*. §§ 9.1, 9.2.
[27] *Id.* § 9.1(a).
[28] *Id.* § 9.2(a).
[29] *See id*. §§ 9.1, 9.2.
[30] Compl. ¶ 29.

Employees' retirement accounts and declared that it had no further pension or health benefits obligations to the Hired Employees.[31] Boeing's decision to classify the Hired Employees as "terminated" instead of "laid off" gives rise to the liabilities at issue in this case.

## D.  BOEING IS SUED FOR BREACH OF ITS CBAS

After Boeing terminated the Hired Employees, certain Hired Employees claimed that Boeing breached its obligation under its CBAs to provide certain early retirement benefits.[32] The Hired Employees claimed that Boeing should have classified them as "laid off" instead of "terminated."[33] Had Boeing classified them as "laid off," the Hired Employees could have accessed a "layoff bridge" under Boeing's Benefit Plans.[34] Pursuant to that "bridge," employees who were laid off within six years of turning 55 and who had at least 10 years of service were allowed to begin collecting early retirement benefits, including pension and retiree medical benefits, upon reaching age 55.[35] Boeing's CBAs, however, placed limits on union employees' entitlement to these early retirement benefits in cases of termination.[36]

On July 21, 2005, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") filed a grievance on behalf of certain Hired Employees (the "UAW Grievants") at the Oklahoma facilities.[37] Boeing denied the UAW's grievance on September 20, 2005.[38] Consistent with the CBA's grievance procedure, the UAW escalated its grievance to arbitration (the "UAW Arbitration").[39]

---

[31] *See* Schedule 6.2(f) to the APA.
[32] Compl. ¶ 30.
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *See id.*
[37] *Id.* ¶ 33.
[38] *Id.*
[39] *Id.* ¶ 34.

8

Similarly, in June and August of 2005, the Society of Professional Engineering Employees in Aerospace ("SPEEA") and the International Association of Machinists and Aerospace Workers ("IAM") filed separate grievances on behalf of Hired Employees at the Kansas facilities.[40] Boeing declined to resolve the grievances.[41] SPEEA and IAM then commenced litigation.[42] Later, individual union members brought a class action suit in United States District Court for the District of Kansas (the "Kansas District Court"). This class action suit was consolidated with the litigation brought by SPEEA and IAM (the "*Harkness* Class Action").

### i. The UAW Arbitration

The UAW Grievants claimed that Boeing's decision to classify them as "terminated" rather than "laid off" resulted in a breach of Boeing's CBA.[43] Article XI, Section 17 of the CBA sets out the basis for breaking seniority and terminating employees.[44] Article XI, Section 17 provides that a worker loses seniority rights, including the "layoff bridge" to early retirement benefits in Boeing's Benefit Plans, if the worker is terminated in any of eleven ways.[45] The UAW Grievants argued that Boeing breached its CBA by classifying them as "terminated" because divestiture of Boeing facilities or alike are not among the listed ways to terminate a worker under Article XI, Section 17.[46] Consequently, the UAW Grievants asserted that Boeing should have designated them as "laid off" after Boeing's divestiture, which would have preserved their rights to early retirement benefits under Boeing's Benefit Plans.[47]

---

[40] *Id.* ¶ 39.
[41] *Id.*
[42] *Id.*
[43] *See* Spirit's Mot. Ex. 20. Exhibits to the parties' motions will be cited as "Spirit's/Boeing's Mot. Ex. __ at p.__" or "Spirit's/Boeing's Mot. Ex. __ " if no page number is provided.
[44] Boeing's Mot. Ex. 14.
[45] *Id.*
[46] *See* Spirit's Mot. Ex. 20.
[47] *See* Spirit's Mot. Ex. 38 at p. 12–13.

The arbitrator agreed with the UAW and sustained the grievance.[48]  The arbitrator found that Boeing violated the CBA when it repudiated its obligation for early retirement benefits to the workers who were, in essence, "laid off."[49]  As a remedy, the arbitrator ordered Boeing to "reinstate seniority of the employees and afford them benefits appurtenant thereto" (the "2008 Award").[50]  After further disputes by the parties, the arbitrator directed the UAW Grievants to apply to Boeing's plan administrator for the plan benefits to which they were entitled.[51]  Should the plan administrator deny their benefits claims, the arbitrator ordered Boeing to assume the plan's obligations to those workers minus any entitlement that they may have under their Spirit benefit plans (the "2009 Award").[52]

Boeing appealed the 2009 Award, arguing that the relief ordered by the arbitrator violated the Employee Retirement Income Security Act of 1974 ("ERISA").[53]  Boeing argued that a claim for ERISA benefits must be submitted to a plan administrator, as properly ordered by the arbitrator.[54]  However, if an ERISA-benefit claim is denied, Boeing argued that a worker's only remedy is a suit under ERISA challenging the plan administrator's interpretation of the plan.[55]  To make its claim, Boeing necessarily construed the arbitrator's remedy as providing ERISA benefits.

The United States District Court for the Northern District of Illinois (the "Illinois District Court") and the United States Court of Appeals for the Seventh Circuit (the "Seventh Circuit") rejected Boeing's claims and upheld the arbitrator's award.[56]  The Illinois District Court and the

---

[48] Spirit's Mot. Ex. 39.
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] Spirit's Mot. Ex. 44.
[53] Boeing's Mot. Ex. 20.
[54] *Id.*
[55] *Id.*
[56] *See* Spirit's Mot. Ex. 48, Ex. 51.

10

Seventh Circuit both disagreed with Boeing's classification of the award as one for ERISA benefits.[57]

### ii. The Harkness Class Action

The *Harkness* Class Action arose out of the same circumstances as the UAW Arbitration. Under the CBA at issue here, an employee's active Boeing employment could end only in specific, enumerated events. These specific, enumerated events included a situation where Boeing "laid off" employees.[58] The *Harkness* Class Action plaintiffs' complaint alleged that Boeing's decision to "terminate due to divestiture" fits into the broad definition of "layoff" enumerated in the CBA.[59] The *Harkness* Class Action plaintiffs thus contended that their "termination" was, in effect, a "lay off" such that they maintained their rights to the early retirement benefits under Boeing's Benefit Plans.[60]

The *Harkness* Class Action plaintiffs sued for breach of contract, and violations of ERISA and the Labor Management Relations Act of 1947 ("LMRA").[61] The complaint named both Boeing and Spirit as defendants, as neither agreed to pay for the early retirement "bridging rights" to pension and health benefits.[62] After years of discovery, the *Harkness* Class Action plaintiffs dismissed all claims against Spirit with prejudice.[63]

Boeing and the *Harkness* Class Action plaintiffs filed cross-motions for summary judgment.[64] The Kansas District Court denied the cross-motions, finding that the CBAs were ambiguous as to the meaning of "laid off."[65] On June 12, 2014, Boeing reached a settlement

---

[57] *See id.*
[58] Spirit's Mot. Ex. 57 p. 7.
[59] Spirit's Mot. Ex. 52 at 8.
[60] *Id.* at 8–18.
[61] *Id.* at 22–40.
[62] *Id.* at 1.
[63] Spirit's Mot. Ex. 63 at p. 6.
[64] Compl. ¶ 40.
[65] Spirit's Mot. Ex. 64 p. 37–38.

with the *Harkness* Class Action plaintiffs.[66]  Under the settlement, Boeing agreed to contribute to a settlement fund for the benefit of class members to resolve their claims for pension and retiree medical benefits.[67]

Boeing now seeks indemnification from Spirit for the costs (and/or damages) Boeing paid and will pay for the UAW Arbitration and the *Harkness* Class Action.

### III. PARTIES' CONTENTIONS

#### A.  BOEING'S CONTENTIONS

Boeing argues that the liabilities at issue are Spirit's Assumed Liabilities under the APA. To reach this conclusion, Boeing classifies the costs of the UAW Arbitration and the *Harkness* Litigation as costs related to employee benefits assumed by Spirit under the APA.  Boeing argues that the payments made to the UAW Grievants and the *Harkness* Class Action plaintiffs were payments for early retirement benefits due under Boeing's Benefit Plans.  Boeing claims, under its interpretation, that Spirit is responsible for these benefits because Spirit assumed liability for pension and retiree medical benefits for Hired Employees under Sections 1.2(a)(iv) and 6.2. Therefore, Boeing contends that Spirit must indemnify Boeing for these Assumed Liabilities under the terms of Section 9.2(a)(iii).

#### B.  SPIRIT'S CONTENTIONS

Spirit argues that the liabilities at issue are Excluded Assets and Excluded Liabilities under the APA.  To reach this conclusion, Spirit classifies the costs of the UAW Arbitration and *Harkness* Class Action as damages for breach of Boeing's CBAs.  Under this interpretation, Spirit claims that it need not indemnify Boeing for the damages because, under the express language of Sections 1.1(a)(v) and 1.1(b)(xiii), Boeing's CBAs are Excluded Assets not assumed

---

[66] Compl. ¶ 43.
[67] *Id.*

by Spirit. Alternatively, Spirit contends that, even if Boeing is correct that the liabilities arose out of Boeing's Benefit Plans, Spirit did not agree under Sections 1.2(a)(iv) and 6.2 to assume liability for Boeing's Benefit Plans. Spirit argues that, instead, Section 6.2 required Spirit to create its own benefit plans for the Hired Employees. As such, Spirit disclaims liability. Moreover, Spirit asserts counterclaims for indemnification under Section 9.1(a)(iv) for those costs incurred by Spirit in the various litigations relating to this issue under the APA.

## IV. STANDARD OF REVIEW

The standard of review on a motion for summary judgment is well-settled. The Court's principal function when considering a motion for summary judgment is to examine the record to determine whether genuine issues of material fact exist, "but not to decide such issues."[68] Summary judgment will be granted if, after viewing the record in a light most favorable to a nonmoving party, no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.[69] If, however, the record reveals that material facts are in dispute, or if the factual record has not been developed thoroughly enough to allow the Court to apply the law to the factual record, then summary judgment will not be granted.[70] The moving party bears the initial burden of demonstrating that the undisputed facts support his claims or defenses.[71] If the motion is properly supported, then the burden shifts to the non-moving party to demonstrate that there are material issues of fact for the resolution by the ultimate fact-finder.[72]

---

[68] *Merrill v. Crothall-American Inc.*, 606 A.2d 96, 99-100 (Del. 1992) (internal citations omitted); *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*, 312 A.2d 322, 325 (Del. Super. 1973).
[69] *Id.*
[70] *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962); *see also Cook v. City of Harrington*, 1990 WL 35244 at *3 (Del. Super. Feb. 22, 1990) (citing *Ebersole*, 180 A.2d at 467) ("Summary judgment will not be granted under any circumstances when the record indicates . . . that it is desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.").
[71] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1970) (citing *Ebersole*, 180 A.2d at 470).
[72] *See Brzoska v. Olsen*, 668 A.2d 1355, 1364 (Del. 1995).

Where, as here, the parties have filed cross motions for summary judgment and have not argued that there are genuine issues of material fact, "the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[73] Neither party's motion will be granted unless no genuine issue of material fact exists and one of the parties is entitled to judgment as a matter of law.[74]

## V. DISCUSSION

Boeing's claims and Spirit's counterclaims all seek relief through the interpretation and application of the terms of the APA. The APA is governed by Delaware law.[75] Under Delaware law, the Court generally interprets a contract as a matter of law.[76] The Court may interpret an unambiguous contract as a matter of law by giving clear and unambiguous terms their plain and ordinary meaning.[77] An ambiguity exists where a term has more than one interpretation.[78] The Court finds that the APA is unambiguous as to the claims and counterclaims asserted by the parties.

A.    THE UAW ARBITRATION AND THE *HARKNESS* CLASS ACTION AROSE OUT OF BOEING'S CBAS

Boeing and Spirit classify the liabilities at issue differently and, as a result, rely on different provisions of the APA to allocate liability. To resolve this dispute, the Court first analyzed the UAW Arbitration and the *Harkness* Class Action in order to determine the type of liabilities at issue. After making this determination, the Court then determined how these liabilities are apportioned in the APA, and accordingly, which party is liable. After a thorough review of the various litigations and the APA, the Court finds that the liabilities associated with

---

[73] Super. Ct. Civ. R. 56(h).
[74] *E.I. DuPont de Nemours and Co. v. Medtronic Vascular, Inc.*, 2013 WL 261415, at *10 (Del. Super. Jan. 18, 2013).
[75] APA § 11.13.
[76] *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 286 (Del. 2001).
[77] *Id.* at 288.
[78] *Id.*

14

the UAW Arbitration and the *Harkness* Class Action arose out of Boeing's CBAs, not Boeing's Benefit Plans.

### i. *The UAW Arbitration arose from Boeing's breach of its CBAs*

The Court finds that the UAW Arbitration arose out of Boeing's CBAs, and more specifically, Boeing's breach of its CBAs. The UAW Grievants pursued their claim as arising out of Boeing's CBAs and prosecuted it as such. The UAW Grievants claimed that Boeing's decision to "terminate" rather than "lay off" certain Hired Employees resulted in a breach of Boeing's CBA.[79] The UAW Grievants repeatedly characterized their claim in this light, including on appeal to the Seventh Circuit when it stated, "This case is conceptually simple. An employer took an action — 'terminating' employees instead of laying them off — that their union contended violated the collective bargaining agreement."[80] Additionally, in their request for relief, the UAW Grievants asked to be reinstated and "made whole for any losses they suffered as a result of the employer's breach of contract, including make-whole relief for their loss of pension and insurance benefits."[81]

Boeing argues the UAW Arbitration dealt with employee benefits because the UAW Grievants principally sought pension and retiree medical benefits owed under Boeing's Benefit Plan.[82] However, under Boeing's own admission at the arbitration hearing, this was not the purpose of the UAW arbitration or the intent of the parties in seeking arbitration. Boeing stated,

> The grievance involves only a narrow and limited contract interpretation issue. The Union's only claim is that the Company, by designating certain bargaining unit members as terminated when it sold the plants where they worked, discharged them without cause in violation of Article XI, Section 17 of the contract.[83]

---

[79] Spirit's Mot. Ex. 20.
[80] Spirit's Mot. Ex. 49 at p. 19.
[81] *Id.* at 22.
[82] Boeing's Mot. p. 31.
[83] Spirit's Mot. Ex. 37 at p. 18.

15

Under Boeing's own approach to the arbitration, this made the issue before the arbitrator a CBA issue, not a benefits issue.

The parties' approach to, or characterization of the arbitration is further supported by the nature of the arbitration itself. In agreeing to arbitration, the parties asked the arbitrator to answer two questions: whether the parties' dispute involved the application and interpretation of the CBA, and was therefore arbitral, and if so, whether Boeing violated a CBA.[84] The arbitrator answered both questions in the affirmative, noting as to the first that he "has limited jurisdiction extending only to grievances involving interpretation or application of" the CBA.[85] By finding that he possessed jurisdiction, the arbitrator confirmed that the UAW arbitration involved the application and interpretation of Boeing's CBA. Had it simply been an employee benefits issue as Boeing later argued, the arbitrator would not have had jurisdiction to arbitrate the claim.

The arbitrator's award is also instructive on the issue before the Court. The arbitrator first ordered Boeing to "reinstate seniority of the employees and afford them benefits appurtenant thereto" and later ordered Boeing to assume the plan's obligations to the workers.[86] Based on this characterization, Boeing argues that the UAW Arbitration was about employee benefits because "the arbitrator held (and the courts agreed) that the Hired Employees were entitled to the amounts they would have received under Boeing's plans" had Boeing laid them off.[87] However, the arbitrator later clarified what he meant when he used the term "benefits" in his decision. The arbitrator stated that "it was not his intent to use that term in the same manner as it is used in [ERISA]."[88] Rather, he meant it to be "a 'short-hand' way of referring to the

---

[84] Spirit's Mot. Ex. 39.
[85] *Id.*
[86] *See* Spirit's Mot. Ex. 39, Ex. 44.
[87] Boeing's Mot. p. 28.
[88] Spirit's Mot. Ex. 58.

16

remedy of making the affected employees whole for [Boeing's] violation of the" CBA.[89]  As in any breach of contract action, the arbitrator tried to give the UAW Grievants what they would have been entitled to had they been laid off.  The reasoning of the arbitrator confirms that his award was a remedy of contract damages to compensate the UAW Grievants for Boeing's breach of its CBA.

The courts involved agreed with the arbitrator's decision as to what was at issue.  In the appeal of the arbitrator's award, Boeing repeatedly construed the arbitrator's award as providing ERISA benefits and challenged the award for this reason.  The Illinois District Court and the Seventh Circuit disagreed.  The Illinois District Court acknowledged that Boeing's breach of the CBA resulted in lost benefits under Boeing's Benefit Plans.[90]  However, the Illinois District Court held that the purpose of the arbitrator's remedy was to "make those employees whole, by placing them in the same status they held on the date of the sale and to require Boeing to provide any benefits the employees lost as a result of the sale and Boeing's breach" of the CBA.[91]

The Seventh Circuit agreed with and affirmed the Illinois District Court's rulings.  The Seventh Circuit also classified the remedy as damages for breach of contract, not benefits—"The arbitrator awarded what amount to damages for breach of contract *measured* by the benefits of which the breach deprived the workers, who were third-party beneficiaries under the collective bargaining contract."[92]

In response to the foregoing, Boeing now argues, as a final point, that because the arbitrator measured damages *based on* ERISA benefits, the damages are in fact an award for

---

[89] *Id.*
[90] *See* Spirit's Mot. Ex. 48 at p. 7.
[91] *Id.*
[92] Spirit's Mot. Ex. 51 at p. 7.

payment of ERISA benefits.[93] The Court finds that what Boeing describes here, however, is how expectation damages awards are calculated—by looking to the "reasonable expectations of the parties *ex ante*."[94] Expectation damages reference what the aggrieved party stood to gain absent the breach. In this case, the determination depends upon the benefits under Boeing's Benefit Plans. This does not mean, however, that the damages can be recast as something other than contract damages. As the Illinois District Court noted, to do so in this case would "turn every order that awards damages based on lost benefits to be paid over time into an ERISA plan."[95] The Court does not agree with Boeing's interpretation of the damages award in the UAW Arbitration, and finds that this award was for a breach of the CBA.

### ii. The Harkness Class Action arose from Boeing's breach of its CBAs

The *Harkness* Class Action also arose from Boeing's CBAs, and more specifically, Boeing's breach of its CBAs. Like the UAW Grievants, the *Harkness* Class Action plaintiffs maintained claims predicated on a breach of a CBA. From the beginning, the *Harkness* Class Action plaintiffs claimed that Boeing's decision to "terminate" rather than "lay off" certain Hired Employees resulted in a breach of Boeing's CBAs. IAM explained that "the Union is filing this grievance against [Boeing] on behalf of all adversely affected employees because of Boeing's violation of Attachment B to the CBA."[96] Similarly, SPEEA contested the coding of its represented members as "terminated" and claimed that it violated Article 8 and Article 21 of the CBA.[97] Later during litigation in the Kansas District Court, the *Harkness* Class Action plaintiffs argued that "the crux of the Complaint was that Boeing breached its CBAs . . . ."[98] In essence,

---

[93] Boeing's Mot. p. 28–29.
[94] *See Sia Techs. Inc., v. PharmAthene, Inc.*, 132 A.3d 1108, 1130 (Del. 2015).
[95] Spirit's Mot. Ex. 61 at p. 5.
[96] Spirit's Mot. Ex. 18.
[97] Spirit's Mot. Ex. 24.
[98] Spirit's Mot. Ex. 69 at p. 36.

the promise by Boeing in the CBAs, and the breach of that promise, underpinned all of the *Harkness* Class Action plaintiffs' claims.

Also similar to the UAW Arbitration, the nature of the *Harkness* Class Action is itself instructive on the issue before the Court. To bring a claim under section 301 of the LMRA, as the *Harkness* Class Action plaintiffs did, the claim must involve a CBA. Section 301 clearly provides for "suits for violation of contracts between an employer and a labor organization."[99] The United States Supreme Court has subsequently interpreted section 301 as governing claims "founded directly on rights created by [CBAs], and also claims substantially dependent on analysis of a [CBA]."[100] Therefore, absent a claim grounded in a CBA, the *Harkness* Class Action plaintiffs could not have argued that Boeing violated section 301 of the LMRA.

The Kansas District Court, though addressing the *Harkness* Class Action plaintiffs' claims on cross-motions for summary judgment, ultimately reached the same conclusion as the adjudicators in the UAW Arbitration. The Kansas District Court found that all of *Harkness* Class Action plaintiffs' claims fundamentally arose from an alleged CBA breach. The Kansas District Court framed the case as follows: "[i]n this case, the contracts in question are the CBAs and the fundamental issues revolve around the meaning and effect of the terms 'laid off' and 'layoff,' which appear numerous times in the CBAs as well as in Boeing documents."[101] The Kansas District Court found the CBAs to be ambiguous with respect to the meaning of "laid off," and consequently denied summary judgment.[102] While the Kansas District Court left the issue of whether Boeing breached the CBA for trial, the ruling is clear that the dispute centered on Boeing's CBAs.

---

[99] 29 U.S.C. § 185(a).
[100] *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 387 (1987).
[101] Spirit's Mot. Ex. 64 at p. 37.
[102] *Id.* at 37–39.

### iii. In both cases, but for the CBAs, the UAW Grievants and the Harkness Class Action plaintiffs could not have maintained a claim against Boeing

Boeing contends that the two proceedings arose from Boeing's Benefit Plans because the litigants included members of Boeing's Benefit Plans.[103] The Court finds that Boeing's argument does little to prove that either proceeding arose from Boeing's Benefit Plans. The Court agrees that: (i) Boeing's Benefit Plans set forth the early retirement benefits; and (ii) the UAW Grievants and the *Harkness* Class Action plaintiffs sought to recover these early retirement benefits. In both proceedings, however, the arbitrator or the applicable court determined that the issue was whether Boeing improperly classified certain Hired Employees as "terminated" under the terms of the CBAs. The Court agrees. It is the contractual terms of the CBAs, not Boeing's Benefit Plans, which directed the UAW Arbitration and *Harkness* Class Action. Moreover, the CBAs' contractual terms are what allowed both sets of parties to sustain a claim for breach of contract.

The Court's determination that the UAW Arbitration and the *Harkness* Class Action involved a breach of the CBAs is further supported by the fact that the proceedings exclusively involved union members. The Court notes that only union members—or those covered by the CBAs—commenced legal proceedings. This supports the finding that the CBAs, and not Boeing's Benefit Plans, gave rise to the two proceedings. Non-union members—or those not covered by the CBAs—did not commence legal proceedings or join in the UAW Arbitration or the *Harkness* Class Action. The logical conclusion is that the terms of Boeing's Benefit Plans did not place limits on early retirement benefits in cases of termination. Had Boeing's Benefit Plans done so, both union and non-union members could have challenged Boeing's classification

---

[103] *See* Boeing's Mot. p. 31.

of the employees as "terminated." The Court reviewed the parties in those proceedings and it is clear that the plaintiffs were only union members.

**B.** **BECAUSE THE LIABILITIES AROSE OUT OF BOEING'S CBAS, THE LIABILITIES ARE EXCLUDED ASSETS AND EXCLUDED LIABILITIES FOR WHICH SPIRIT HAS NO INDEMNIFICATION OBLIGATION**

By first classifying the liabilities at issue, the Court can now determine how the liabilities are apportioned in the APA, and, ultimately, which party is liable. Based on the plain language of Sections 1.1 and 1.2, Boeing's CBAs constitute Excluded Assets and Excluded Liabilities not transferred by Boeing or assumed by Spirit. Therefore, Spirit need not indemnify Boeing.

Under Section 1.1(a)(v), the assets purchased by Spirit include "all Contracts primarily related to the business . . . but not including the Contracts described in Section 1.1(b)."[104] Section 1.1(b) then lists certain Excluded Assets not transferred or conveyed to Spirit, which include contracts such as "the existing collective bargaining agreements covering employees of the business."[105] The CBAs are considered contracts, as the APA defines "Contracts" broadly as "any written contract, *agreement*, license, mortgage, note, guarantee, sublicense, consensual obligation, commitment, lease, sales or purchase order or other legally binding commitment (whether written or oral" in the nature of a contract."[106] Section 1.1(a)-(b) states that Spirit shall not acquire any assets other than those specifically set forth in Section 1.1(a). Therefore, the CBAs are clearly Excluded Assets retained by Boeing after the sale of the Kansas and Oklahoma facilities.

That the CBAs are an Excluded Asset is further reflected in the language of Section 1.2(a)-(b)—the provisions apportioning liability between the parties. Section 1.2(a) provides for Spirit's Assumed Liabilities, and states that the only contracts assumed by Spirit are "Assigned

---

[104] APA § 1.1(a)(v).
[105] *Id.* § 1.1(b)(xiii).
[106] *See id.* § 12.1 (emphasis added).

21

Contracts." The APA previously defined "Assigned Contracts" in Section 1.1(a)(v) to mean "all Contracts primarily related to the business . . . but not including the Contracts described in Section 1.1(b)." The CBAs—specifically as Excluded Assets in Section 1.1(b)(xiii) and broadly from the entirety of Section 1.2(a)—are not Assumed Liabilities under Section 1.2(a). Section 1.2(b) then provides for certain Excluded Liabilities not assumed by Spirit. The Excluded Liabilities include "Liabilities under any Contract not assumed by Buyer under Section 1.2(a) . . ."[107] The CBAs are not one of the contracts assumed by Spirit and, therefore, are not Assumed Liabilities under Section 1.2(a). Instead, the CBAs are Excluded Liabilities.

Boeing nonetheless argues that Spirit assumed liability for the CBAs. Boeing interprets Section 1.2(b)(xiii) as excluding certain "Liabilities," not "Assets," from Spirit's Assumed Liabilities. Put another way, Boeing reads Section 1.2(b)(xiii) as excluding contractual "Liabilities" unless those "Liabilities" are assumed by Spirit pursuant to Section 1.2(a). Because Spirit assumed "Liabilities for pension Liability, Accrued Vacation, retiree medical, flexible spending accounts, sick leave, and personal time,"—all of which grew out of contracts—those liabilities are not Excluded Liabilities, even if Spirit did not assume the entire contracts out of which those liabilities arise.[108]

In light of Spirit's other Assumed Liabilities, the Court rejects Boeing's reading of Section 1.2(b)(xiii). Spirit's assumption of liabilities in Section 1.2 reflects Spirit's intent to assume only those liabilities over which it had control. Multiple provisions throughout Section 1.2 state that Spirit assumed only those liabilities that arose after closing; Spirit did not assume liability "arising out of any act or omission that occurred prior to closing."[109] In fact, the parties carefully crafted Section 1.2(a)(iii) as a gap provision wherein Spirit disclaimed contractual

---

[107] *Id.* § 1.2(b)(xiii).
[108] *See id.* § 1.2(a)(iv).
[109] *See id.* § 1.2(a)(ii),(iii),(v),(vi), (vii),(ix).

liability for certain Assigned Contracts entered into by Boeing prior to closing.[110] Boeing's

interpretation would contravene this clear intent by having Spirit assume liability for Boeing's

CBAs, which Boeing negotiated and executed before closing. The Court finds it illogical that

Spirit would agree in one discrete instance to assume the liabilities associated with Boeing's

CBAs, when Spirit was not assuming those agreements or otherwise had control over the

agreements which could create those liabilities. The Court believes that the parties would have

included a cross-reference to Section 1.2(a)(iv) in Section 1.1(b)(xiii) had they intended to

subject this Excluded Asset to an exception.

Boeing argues that, if the CBAs and related liabilities are Excluded Assets and Excluded

Liabilities, there is no scenario under which Spirit would be liable for Hired Employees' pension

and retiree medical benefits. Boeing claims that this would render Section 1.2(a)(iv)

meaningless. This is not true. Under Section 6.2, Spirit agreed to establish three separate

pension plans for union and non-union Hired Employees, and then include credit for those Hired

Employees' past service with Boeing for eligibility, vesting, early retirement, and accrued

benefits.[111] The credit applied after Boeing transferred the assets in Boeing's Pension Plans to

Spirit's new pension plans.[112] After this transfer, Boeing had no further obligation for those

assets.[113] If, then, Spirit refused to credit the Hired Employees' past service with Boeing, and the

Hired Employees' sought payment from Boeing for their accrued service, Boeing could then

seek indemnification from Spirit.

Nothing in Section 6.2, however, provides that Spirit assumed liability for Boeing's

CBAs or the liabilities associated with those CBAs, including liability that resulted from

---

[110] *See id.* § 1.2(a)(iii).
[111] *See id.* § 6.2(a),(f).
[112] *Id.* § 6.2(f).
[113] *Id.*

23

Boeing's breach of its own CBAs. Spirit's only obligation was to create its own pension plans and credit Hired Employees' for its past service with Boeing subject to the conditions of its own collective bargaining agreements.[114] Spirit then created benefit plans that mirrored Boeing's, including its own "layoff bridge." As it pertained to health benefits, however, Section 6.2(g) allowed Spirit to "make changes in or amendments to any Buyer retiree medical plan following the Closing."[115] Given all of this, the Court cannot find that Spirit agreed to assume the liabilities of Boeing's CBAs, including Boeing's Benefit Plans.

Therefore, Spirit need not indemnify Boeing for the liabilities arising from its CBAs because the CBAs are Excluded Liabilities. Section 9.2(a) provides that Spirit need only indemnify Boeing for its Assumed Liabilities. There is nothing in Section 9.2(a) providing that Spirit must indemnify Boeing when Boeing bears its own retained liabilities. Accordingly, the Court finds that Spirit did not breach is indemnity obligations under the APA, and it need not indemnify Boeing for the costs related to the UAW Arbitration and the *Harkness* Class Action.

## C. BOEING MUST INDEMNIFY SPIRIT FOR THE COSTS OF LITIGATION STEMMING FROM THE PRESENT DISPUTE

As a final matter, Spirit counterclaimed against Boeing for breach of contract and declaratory judgment.[116] Spirit contends that Boeing breached the APA by failing to honor its obligation under Section 9.1(a) to indemnify Spirit for certain Indemnifiable Damages.[117] As a result, Spirit seeks a declaration that Spirit must indemnify it for fees, costs, and expenses for: (i) participating in the *Harkness* Class Action, (ii) responding to Boeing's indemnification demands

---

[114] *See id.* § 6.2(g) (explaining that Spirit "shall provide each such Hired Employee full credit for periods of service prior to the Closing . . . *subject to the provisions of any collective bargaining agreement between [Spirit] and the unions*).

[115] *Id.*

[116] *See* Answer ¶¶ 36–62.

[117] *Id.* ¶¶ 56–65.

and participating in the dispute resolution process, (iii) defending itself against Boeing's allegations and claims in this case, and (iv) asserting and prosecuting the Counterclaim.[118]

The Court has already held that all liabilities related to Boeing's CBAs are considered Excluded Liabilities. Furthermore, under Section 9.1(a), Boeing must indemnify Spirit for Indemnifiable Damages incurred by Spirit in connection with or arising from the Excluded Liabilities.[119] Consequently, because the costs and expenses cited by Spirit all arose from Excluded Liabilities, *i.e.* Boeing's CBAs, Boeing must indemnify Spirit for these costs and expenses.

As to the latter three items of damages, Spirit is also entitled to recovery under Section 11.15. Section 11.15 provides that a prevailing party is entitled to recover "reasonable attorneys' fees and other costs incurred" in connection with any proceeding for the enforcement of the APA, or "because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions" in the APA.[120] Boeing brought this civil action to enforce the APA after an alleged "breach" of Spirit's indemnification obligation. Therefore, Spirit is entitled to recover reasonable attorneys' fees and other costs incurred in defending against Boeing's claims and in asserting its Counterclaim.[121]

## VI. CONCLUSION

For the reasons set forth herein, the Court declares that Spirit did not breach the APA and is not obligated to indemnify Boeing for the costs associated with the UAW Arbitration and the *Harkness* Class Action. The Court further declares that Boeing breached the APA and is obligated to indemnify Spirit for the costs stemming from the present dispute. Accordingly, the

---

[118] *Id.* ¶ 47.
[119] APA § 9.1(a).
[120] *Id.* § 11.15.
[121] The Court notes that Boeing did not respond to Spirit's arguments for attorneys' fees.

Court **DENIES** the Boeing Company's Motion for Summary Judgment and **GRANTS**

Defendant-Counterclaim Plaintiff Spirit Aerosystems, Inc.'s Motion for Summary Judgment.

**IT IS SO ORDERED.**

Dated: June 27, 2017
Wilmington, Delaware

*/s/ Eric M. Davis*
Eric M. Davis, Judge